SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Samander S. Dabas** (A-109-11) (069498)

**Argued March 11, 2013 -- Decided July 30, 2013**

**ALBIN, J., writing for a unanimous Court.**

The issue in this appeal is whether the prosecutor's office violated an established discovery rule when its investigator destroyed his notes of a two-hour pre-interview of defendant and, if there was a violation, whether the trial court abused its discretion in denying the defense an adverse-inference charge.

Defendant Samandar Dabas worked part-time at a Dollar City store in the South Brunswick Square Mall. On August 24, 2004, Dabas brought his wife, Renu, with him to Dollar City where he was scheduled to work a shift. At some point, Dabas left Renu stocking shelves while he went to a nearby liquor store to purchase a bottle of Dewar's Scotch. Back at the store, Dabas drank two coffee mugs of Scotch and water. At approximately 9:00 p.m., Dabas closed the store and walked with Renu to his parked minivan. As Dabas began driving out of the parking lot with Renu seated beside him, the minivan struck a tree, causing the airbags to deploy. A short time later, witnesses observed Renu's unconscious body, half lying in the mall parking lot and half on the sidewalk. She was bleeding from her mouth, nose, and ears. In the meantime, Dabas was seen moving between the opened hood of the minivan and the driver's seat, not paying any attention to his seriously injured wife.

Paramedics arrived at the scene and transported Renu to the hospital. Renu died of her injuries on August 27. The Medical Examiner determined that Renu died of blunt-force head injuries. After the ambulance left the mall parking lot, at around 10:00 p.m., South Brunswick Patrol Officer Laszlo Nyitrai questioned Dabas. Dabas smelled of alcohol and admitted to drinking alcohol, but could not explain what happened that night. Officer Nyitrai arrested Dabas for driving while intoxicated and read him the Miranda rights. Dabas was transported to a hospital where blood samples were taken. The samples were tested at a New Jersey State Police laboratory and showed a blood alcohol content (BAC) of .209. At the approximate time his minivan struck the tree, Dabas's BAC was estimated to be .23 or almost three times above the statutory level defining a person as driving while intoxicated.

At police headquarters, Investigator John Dando of the Middlesex County Prosecutor's Office conducted a "pre-interview" of defendant, which – in accordance with the procedures of the prosecutor's office – was not electronically recorded. Dabas appeared "lucid" and "coherent." As Dabas responded, Dando wrote down his answers on a notepad. While on the stand recalling what was said during the pre-interview, Dando did not testify from his notes. He had destroyed them more than a year after Dabas's indictment in accordance with standard protocols of his office. Instead, he referred to a February 15, 2006, typewritten final report into which he had purportedly incorporated his notes. Dando explained that Dabas was asked "open-ended questions" and admitted to drinking two coffee mugs of Dewar's Scotch and water before entering the minivan and striking the tree. When asked why he hit his wife, Dabas responded, "she made me mad." Dabas explained to Dando that, following the crash, Renu exited the minivan and refused to get back inside. Dabas explained that he drove the minivan toward Renu "to teach her who the boss was" and that he intended "to bump her with the van."

At around 5:15 a.m., the investigators took an approximately fifteen-minute tape-recorded statement from Dabas. On tape, Dabas acknowledged again that he understood his Miranda rights. Dando then asked "mostly leading" questions using his handwritten notes. On tape, Dando elicited from Dabas mostly damning, one-word answers. Dabas was initially charged with aggravated assault. On August 28, a day after Renu's death, Dabas was charged with murder and with attempting to leave the scene of a fatal motor vehicle accident. More than a year after the return of an indictment charging Dabas with murder, Dando completed a final report into which he purportedly incorporated his interview notes and then destroyed those notes.

At trial, the State presented Dabas's own words – his words in the pre-interview as recounted by Dando and his one-word answers to Dando's leading questions in the taped statement. The State argued that Dabas deliberately drove his minivan into Renu with the purpose of inflicting serious bodily injury, thereby causing her death. The defense argued that Renu's injuries were not consistent with having been struck by a vehicle. The jury was permitted to consider intoxication as a defense and the alternatives of aggravated manslaughter and manslaughter. At the charge conference, the defense requested that the court instruct the jury that it could draw an adverse inference from Dando's destruction of his pre-interview notes. The State objected, arguing "that there's no case law in New Jersey that requires police officers in New Jersey to preserve notes."

The trial court declined to give the adverse-inference charge, concluding that "the [S]tate is under no obligation to preserve handwritten reports prepared by officers in the field." The jury found Dabas guilty of both murder and attempting to leave the scene of a fatal motor vehicle accident. Defendant appealed. The Appellate Division reversed the murder conviction on the ground that the trial court erred in not giving the requested adverse-inference charge. The panel affirmed the attempting-to-leave-the-scene conviction. The Supreme Court granted the State's petition for certification. 210 N.J. 217 (2012).

**HELD:** The prosecutor's office violated its post-indictment discovery obligations under Rule 3:13-3, when its investigator destroyed his notes of a two-hour pre-interview of defendant. The trial court abused its discretion in denying defendant's request for a charge that would have allowed the jury to draw an adverse inference from the destruction of the interview notes more than a year after the return of the indictment.

1. "Once an indictment has issued, a defendant has a right to automatic and broad discovery of the evidence the State has gathered in support of its charges." State v. Scoles, ___ N.J. ___, ___ (2013) (slip op. at 22). The State must tender discovery even without a request. Within the meaning of Rule 3:13-3(c)(2), there is little question that Dando's notes of Dabas's pre-interview statements constituted discoverable material that the prosecutor was required to make available to the defense. Defense counsel did not have to request discovery that the prosecutor was obliged to produce, nor did defense counsel have to possess the foresight that one of the prosecutor's investigators was withholding interview notes of statements made by Dabas and intended to destroy them. By not providing the notes to defense counsel, the prosecutor violated the clear rule governing post-indictment discovery. (pp. 23-27)

2. This Court has repeatedly disapproved of law enforcement officers discarding interview notes before the prosecutor's post-indictment discovery obligations become operative pursuant to Rule 3:13-3(b). In State v. Cook, 179 N.J. 533 (2004), and State v. Branch, 182 N.J. 338 (2005), the Court expressly disapproved of this "practice of destroying contemporaneous notes." In this case, the prosecutor's office decided that this Court's declarations were mere "dicta" and that it was free to destroy contemporaneous interview notes both before and after indictment. The prosecutor's office is not at liberty to disregard a pronouncement of this Court, even if that pronouncement is properly characterized as dictum. Nevertheless, the prosecutor's obligation to abide by Rule 3:13-3(b) in the post-indictment setting, which includes the production of interview notes, is not dicta. (pp. 27-32)

3. The danger of Investigator Dando destroying his contemporaneous interview notes should be self-evident. The words in the interview report were filtered through an investigator who, understandably, had developed a distinct view of the case. The potential for unconscious, innocent self-editing in transferring words, sentence fragments, or full sentences into a final report is a real possibility. So is the potential for human error in the transposition of words from notes into a report. By destroying his notes, Dando made himself the sole judge of what actually was contained in his contemporaneous notes. If there were differences between the notes and the final report, Dabas had a right to present them to the jury in his defense to the murder charge. (pp. 32-34)

4. An adverse-inference charge is one permissible remedy for a discovery violation, such as the destruction of interrogation notes that should have been turned over to the defense. The charge is a remedy to balance the scales of justice, even outside of the realm of a discovery violation. The same logic applies, perhaps with even greater force, to the destruction of interrogation notes in the post-indictment stage. The trial court abused its discretion in not giving the adverse-inference charge. The failure to give the charge was "clearly capable of producing an unjust result." R. 2:10-2. (pp. 34-37)

The judgment of the Appellate Division is **AFFIRMED**, and the matter is **REMANDED** for a new trial.

**CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA and PATTERSON, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE HOENS did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

SAMANDER S. DABAS,

    Defendant-Respondent.


        Argued March 11, 2013 – Decided July 30, 2013

        On certification to the Superior Court,
        Appellate Division.

        Nancy A. Hulett, Assistant Prosecutor,
        argued the cause for appellant (Bruce J.
        Kaplan, Middlesex County Prosecutor,
        attorney).

        Marcia H. Blum, Assistant Deputy Public
        Defender, argued the cause for respondent
        (Joseph E. Krakora, Public Defender,
        attorney).

        Michael J. Williams, Deputy Attorney
        General, argued the cause amicus curiae
        Attorney General of New Jersey (Jeffrey S.
        Chiesa, Attorney General, attorney).


    JUSTICE ALBIN delivered the opinion of the Court.

    Defendant Samander Dabas was convicted of the murder of his

wife based largely on statements he made to prosecutor's

investigators in the early morning hours of August 25, 2004.  An

investigator's purposeful destruction of his notes taken during

two hours of Dabas's interrogation is at the heart of the appeal before us.

After Dabas's arrest, Investigator John Dando of the Middlesex County Prosecutor's Office conducted a two-hour "pre-interview" during which he asked Dabas open-ended questions and recorded, in handwritten notes, Dabas's answers. Then, Investigator Dando -- using his interview notes -- conducted a tape-recorded interrogation of Dabas, lasting approximately fifteen minutes. During this abbreviated interrogation, Investigator Dando asked Dabas leading questions that mostly elicited one-word answers, some of which were highly incriminating.

Dabas was indicted for murder and a related offense. At the time of Dabas's indictment, and for over one year afterwards, Investigator Dando's notes of Dabas's statements made during the two-hour pre-interview remained in the prosecutor's file. The prosecutor's office did not provide those notes to the defense as required by our discovery rule, R. 3:13-3,[1] and case law, see State v. Marshall, 123 N.J. 1, 133-34 (1991), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993). Instead, Investigator Dando prepared a final

---

[1] Throughout this opinion, we refer to the version of the discovery rule that was in effect during the relevant events in this case. On January 1, 2013, the discovery rule was amended. None of these amendments alter the analysis in this case.

2

typewritten report into which he purportedly incorporated his contemporaneous interview notes.  In the report, Investigator Dando concluded that Dabas purposely killed his wife.  With the report completed, Dando destroyed his interview notes.

At trial, the court denied Dabas's request for a charge that would have allowed the jury to draw an adverse inference from the destruction of the interview notes.  The Appellate Division reversed Dabas's conviction based on the trial court's failure to give the adverse-inference charge.

We affirm the Appellate Division.  After a defendant's indictment, as part of its discovery obligations, the prosecution is obliged to provide to the defense any statement made by the defendant that is memorialized in a police officer's notes.  See R. 3:13-3.  Our discovery rule and case law are crystal clear on this point.  Moreover, we have warned prosecutors that we strongly disapprove of the destruction of interview notes, even earlier in the investigative process.  See State v. Cook, 179 N.J. 533, 542 n.3 (2004); State v. Branch, 182 N.J. 338, 367 n.10 (2005).  We sent that message with the expectation that law enforcement officers would preserve their contemporaneous notes of witness interviews.  In State v. W.B., 205 N.J. 588, 608 (2011), we left no doubt that law enforcement officers must preserve their handwritten interview notes even before the State is required to tender discovery to the defense

3

under Rule 3:13-3.  W.B. covered the gap between the investigation and a defendant's indictment.  See ibid.

Here, we are not dealing with the destruction of interview notes before an indictment -- the issue addressed in Cook, Branch, and W.B.  In this case, the prosecutor's office possessed the notes at a time when it was required to provide them to the defense in accordance with Rule 3:13-3.  In violation of that rule, the prosecutor's office withheld the notes from the defense and then destroyed them.  Whether the precise words uttered by Dabas during the two-hour pre-interview were fully and accurately incorporated into Dando's final report, just as they appeared in Dando's handwritten notes, can now never be known.  By shredding those notes, Dando destroyed evidence -- the best evidence of what Dabas said during two hours of interrogation.  Because of the flagrant violation of the discovery rule, we hold that the trial court erred in denying the defense an adverse-inference charge.  That error was "clearly capable of producing an unjust result," R. 2:10-2, and therefore a new trial must be granted.

I.

A.

On December 21, 2004, defendant Samander Dabas was charged in a Middlesex County indictment with the first-degree

4

purposeful or knowing murder of his wife, Renu Dabas, N.J.S.A. 2C:11-3(a)(1) or (2), and the third-degree attempt to leave the scene of a fatal motor vehicle accident, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-5.1.  The facts relevant to this appeal are gleaned from Dabas's twenty-four-day jury trial that began on May 24 and concluded on July 9, 2007.

B.

Dabas immigrated to the United States from India approximately twenty-five years ago and became a citizen of this country and a New Jersey resident.  Sometime in 2003, during a trip to India, Dabas married Renu.  Dabas returned to New Jersey and made arrangements for his wife to secure a visa to enter the United States.  In late July 2004, when Renu arrived in New Jersey, the newlyweds took up residence in the home of Dabas's sister and brother-in-law, Shushila and Jitander Khatri, in South Brunswick.

Dabas worked full-time at a manufacturing company and part-time at the Khatris' Dollar City store in the South Brunswick Square Mall.  On August 24, 2004, Dabas awakened at approximately 6:00 a.m.  He and Renu spent the day together.  At approximately 5:00 p.m., Dabas brought Renu with him to Dollar City where he was scheduled to work a shift.  At some point, Dabas left Renu stocking shelves while he went to a nearby liquor store to purchase a bottle of Dewar's Scotch.  Back at

5

the store, Dabas drank two coffee mugs of Scotch and water.  At approximately 9:00 p.m., Dabas closed the store and walked with Renu to his parked minivan.  As Dabas began driving out of the parking lot with Renu seated beside him, the minivan struck a tree, causing the airbags to deploy.

A short time later, witnesses observed Renu's unconscious body, half lying in the mall parking lot and half on the sidewalk.  She was bleeding from her mouth, nose, and ears.  In the meantime, Dabas was seen moving between the opened hood of the minivan and the driver's seat.  He was not paying any attention to his seriously injured wife.  What occurred in the minutes between the minivan striking the tree and this surreal scene would later be explained in a statement Dabas made to prosecutor's investigators.

When Officer Robert Jairdullo of the South Brunswick Township Police Department arrived at the mall parking lot, shortly after 9:25 p.m., Dabas was behind the wheel, attempting to start the minivan.  Officer Jairdullo approached Dabas, whose eyes were red and glassy and whose breath smelled of alcohol.  Dabas admitted to Jairdullo that he had been drinking.

At about that time, a mall employee brought to the officer's attention that Renu's body was sprawled over the curb.  Jairdullo immediately ran to the severely injured woman, who did

not appear to be breathing.  Then, the officer secured Dabas in his patrol car and returned to render first aid to Renu.

Paramedics arrived on the scene and transported Renu to Princeton Medical Center.  Later, she was transferred to Robert Wood Johnson University Hospital where she died of her injuries on August 27.  The Middlesex County Medical Examiner's Office determined that Renu died of blunt-force head injuries.

After the ambulance left the mall parking lot, at around 10:00 p.m., South Brunswick Patrol Officer Laszlo Nyitrai questioned Dabas, who was seated in the back of Officer Jairdullo's patrol car.  Dabas smelled of alcohol and admitted to drinking alcohol, but could not explain what had happened that night.  Officer Nyitrai placed Dabas under arrest for driving while intoxicated and read him the Miranda rights.[2] Dabas indicated to the officer that he did not wish to respond to further questions.  According to Officer Nyitrai, Dabas was alert, lucid, and coherent throughout their exchange.

At approximately 10:48 p.m., Jairdullo and a fellow officer, Michael Pellino, transported Dabas to a hospital to obtain samples of his blood for drug and alcohol testing.  On the way, Officer Pellino read Dabas the Miranda warnings

---

[2] Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694, 726 (1966).

7

verbatim from a card. Dabas acknowledged that he understood his rights. He was "calm, cooperative, polite, [and] coherent."

While at the hospital, sometime before 11:52 p.m., a nurse drew samples of Dabas's blood, which were later tested at a New Jersey State Police laboratory. At the time the samples were taken, Dabas's blood alcohol content (BAC) was .209. At 9:25 p.m., the approximate time his minivan struck the tree in the mall parking lot, Dabas's BAC was estimated to be .23, and at 9:45 p.m., his BAC reached a peak level of approximately .24. In simple terms, when Dabas operated the minivan in the mall parking lot, his BAC was almost three times above the statutory level defining a person as driving while intoxicated. See N.J.S.A. 39:4-50 (stating that operator drives "while under the influence" if BAC is .08 or greater). From the hospital, the officers took Dabas to South Brunswick Police Headquarters, where he was detained.

C.

At approximately 11:00 p.m., Investigator John Dando of the Fatal Accident Investigation and Prosecution Unit of the Middlesex County Prosecutor's Office arrived at the mall parking lot to survey the scene. He was briefed by South Brunswick police officers and made his own observations.

Dando's investigation at the mall parking lot took approximately two to two-and-a-half hours. Dando called

Lieutenant Raymond Forziati, the head of the Middlesex County Prosecutor's Homicide Unit, and reported that a "pedestrian was struck by a vehicle . . . [and] that it may have been an intentional act." Lieutenant Forziati and another investigator from the prosecutor's office, Todd Gerba, joined Dando at the scene. After concluding their work there, Investigators Dando and Gerba, Lieutenant Forziati, and Officer Nyitrai drove to South Brunswick Police Headquarters, arriving at approximately 2:30 a.m.

At approximately 3:00 a.m. on August 25, 2004, Dando, Gerba, and Nyitrai entered a conference room where Dabas was being held without restraints. They introduced themselves, and Gerba read Dabas the Miranda warnings from a card. Dabas signed and dated the card and verbally acknowledged that he understood his rights.[3]

At trial, Dando testified that Dabas expressed his willingness to speak about the events that led to his wife's injuries. Dando stated that Dabas smelled of alcohol, and "his

---

[3] Officer Nyitrai testified that he advised Investigator Dando at the scene that Dabas, after acknowledging his Miranda rights, indicated that he did not wish to make a statement. Nyitrai stated that this exchange took place before Dando spoke to Dabas. On the other hand, Dando denied having this exchange with Nyitrai. Dando declared that Nyitrai "did not say to me that Mr. Dabas invoked his rights because if he did, knowing what we knew that night, we would not have gone back and questioned him."

eyes were bloodshot and watery." However, in Dando's mind, Dabas appeared not only "calm," "cooperative," and "very attentive," but also "lucid" and "coherent." The investigators and officer then conducted a "pre-interview," which -- in accordance with the procedures of the Middlesex County Prosecutor's Office -- was not electronically recorded.

During the approximately two-hour pre-interview, Dando explained that Dabas was asked "open-ended questions": "What happened, what did you do next, where did this happen, questions like that, telling him that we wanted to know things and then allowing him to fill in those blanks." As Dabas responded, Dando wrote down his answers on a notepad. While on the stand recalling what was said during the pre-interview, Dando did not testify from his notes. He had destroyed them more than a year after Dabas's indictment. Instead, he referred to a typewritten final report into which he had purportedly incorporated his notes. Dando gave the following account.[4]

Dabas admitted to drinking two coffee mugs of Dewar's Scotch and water before entering the minivan and striking the tree in the mall parking lot. When asked about the events following the crash, Dabas's "entire demeanor changed . . . . He crossed his arms in front of him, and he looked directly down

---

[4] Dando's recounting of the pre-interview hews closely to his typewritten final report. Dando referred to that report while testifying.

at the ground," and with reference to Renu, "he said, she wasn't there."  Dabas insisted he did not "know what happened.  She wasn't there.  She was there, but then she wasn't."  Ultimately, Dando asked Dabas directly, "why did you hit your wife[?]"  Dabas responded, "she made me mad."

Dabas explained to Dando that, following the crash, Renu exited the minivan and refused to get back inside even when ordered to do so.  As Renu began to run away, Dabas drove the minivan toward her "to teach her who the boss was."  He intended "to bump her with the van."  Dabas "struck Renu with the right front side of his minivan" close to the storefronts in the mall.  The minivan then stalled and came to a rest.  He was unable to start the minivan again.  Dabas "said . . . that he did not go towards [Renu], and he did not look in her direction."  When asked to explain his behavior, Dabas stated that he was scared.

At the conclusion of the two-hour pre-interview, Dabas agreed to recite "the events of the evening" on tape.  At approximately 5:15 a.m., the two prosecutor's investigators and Officer Nyitrai took an approximately fifteen-minute tape-recorded statement from Dabas.

On tape, Dabas acknowledged again that he understood his Miranda rights.  Investigator Gerba began by asking Dabas open-ended questions about his background.  However, Dando followed up by asking "mostly leading" questions using his handwritten

11

notes.  According to Dando, "I would read him basically what he responded to earlier, and then he would respond yes or no." Dando explained his reason for proceeding in this manner:  "I already had his answers.  They were written down on my notepad. I basically asked him exactly the same question[s] that he had answered and just to keep it flowing, to keep it . . . cohesive and to not allow the tape to go back to being evasive."  Dando stressed that the leading questions were formed from his pre-interview notes.  On tape, Dando elicited from Dabas mostly damning, monosyllabic answers.

The following excerpt illustrates the nature of the leading questions and answers:

> [DANDO:] You saw her running away towards the store.
>
> [DABAS:] Uh-huh.
>
> [DANDO:] At that point, do you feel that she was being disrespectful to you?  . . . because she wouldn't get in the van?
>
> [DABAS:] No.
>
> [DANDO:] Okay.  Did it make you mad that she didn't get in the van?
>
> [DABAS:] Yeah.  I was pissed off.
>
> [DANDO:] You were pissed off at her because she didn't get in.
>
> [DABAS:] Right.
>
> [DANDO:] So you saw her running away from you.  Correct?

12

[DABAS:] Right.

[DANDO:] And then you decided to go after her. Correct?

[DABAS:] Right.

[DANDO:] And you went after her because you wanted to bump her. Correct?

[DABAS:] Correct.

[DANDO:] And you wanted to show her that you were the boss. Correct?

[DABAS:] Right.

Dando destroyed his handwritten, pre-interview notes from August 24, 2004, more than a year and a half later -- after he completed his final typewritten report on February 15, 2006. At the time of their destruction, Dabas had been under indictment for murder since December 2004. Dando explained that he transposed his notes into the final report and then destroyed the notes in accordance with standard protocols of his office. [5]

At approximately 6:00 a.m. on August 25, 2004, after he gave his formal taped statement, Dabas was charged with aggravated assault. On August 28, a day after Renu's death, Dabas was charged with murder.

---

[5] At oral argument before this Court, the Assistant Middlesex County Prosecutor representing the State began her remarks by stating that an investigator "wrote a report that was issued in February of 2006. At the time he finished his report and it was submitted, he destroyed the notes that he took during the pre-interview of defendant at the police station. That was done in accordance with police practice at the time." (Emphasis added).

13

Dabas's trial began on May 24, 2007, and continued for more than six weeks. The State and defense offered differing theories of what likely occurred in the mall parking lot. No eyewitnesses testified to the events that led directly to Renu's death. In addition to medical testimony about the cause of Renu's death and witness testimony about Dabas's behavior while Renu was lying critically injured in the parking lot, the State presented Investigator Dando as an accident-reconstruction expert. Perhaps most powerful of all, the State presented Dabas's own words -- his words in the pre-interview as recounted by Dando and his one-word answers to Dando's leading questions in the taped statement. From this evidence, the State argued that Dabas deliberately drove his minivan into Renu with the purpose of inflicting serious bodily injury, thereby causing her death.

The defense presented evidence in support of its theory that Renu's injuries were not consistent with having been struck by a vehicle, including testimony from medical and forensic experts and an accident-reconstruction expert. The defense argued that her injuries could have been caused by airbag deployment during the initial crash or by an accidental fall, thereby raising reasonable doubt. Between the extremes of the State's argument that Dabas was guilty of purposeful or knowing

murder and the defense's argument that Renu's accidental death compelled an acquittal, the jury was permitted to consider:  (1) intoxication as a defense; and (2) the alternatives of aggravated manslaughter, N.J.S.A. 2C:11-4(a) (recklessly causing death under circumstances manifesting extreme indifference to human life), and manslaughter, N.J.S.A. 2C:11-4(b) (recklessly causing death).

At the charge conference, the defense requested that the court instruct the jury that it could draw an adverse inference from Dando's destruction of his pre-interview notes.  The defense argued that the most damaging evidence came from Dando's testimony about the purported admissions made by Dabas during the pre-interview.  The defense proposed, as a template, the charge given in State v. Zenquis, 251 N.J. Super. 358, 370 (App. Div. 1991) ("The court instructed the jury that if it found [the investigating officer] destroyed his notes at a time when he knew the case was proceeding to trial, it could infer that the notes contained information inconsistent with the witness's trial testimony."), aff'd on other grounds, 138 N.J. 84 (1993).

The prosecutor objected to the charge, arguing "that there's no case law in New Jersey that requires police officers in New Jersey to preserve notes," and dismissed as dictum the footnote in Branch, supra, 182 N.J. at 367 n.10 ("We register our displeasure that police officers engage in the seemingly

15

routine practice of destroying their contemporaneous notes of witness interviews after the preparation of formal reports."). The prosecutor also emphasized that Dabas's attorneys "were involved in the case relatively early, . . . well before Dando's final report was written" and that they made no request that the prosecutor preserve the notes. According to the prosecutor, the failure of defense counsel to make such a request belied their argument that the notes were of critical importance.

The trial court declined to give the adverse-inference charge. The court concluded that "the [S]tate is under no obligation to preserve handwritten reports prepared by officers in the field."

E.

The jury found Dabas guilty of both murder and attempting to leave the scene of a fatal motor vehicle accident. The court sentenced Dabas to a thirty-year term of imprisonment without parole eligibility on the murder conviction and to a concurrent five-year term on the attempting-to-leave-the-scene conviction.[6]

---

[6] We do not detail issues raised during the trial that are not germane to this appeal. For example, after a five-day hearing, the trial court rejected Dabas's motion to suppress his pre-interview and taped statements on the ground that he was intoxicated, not provided an interpreter, and not advised of the charges against him. The court found that Dabas knowingly, intelligently, and voluntarily waived his Miranda rights and that his statements were not the product of coercion.

16

II.

In an unpublished opinion, the Appellate Division reversed the murder conviction on the ground that the trial court erred in not giving the requested adverse-inference charge.[7] The Appellate Division, however, affirmed the attempting-to-leave-the-scene conviction.

In reversing the murder conviction, the appellate panel reasoned that "there was a realistic potential that Dando's contemporaneous notes could have assisted defense counsel in challenging Dando's testimony and the truthfulness of [Dabas's] recorded statement." The panel stressed that with the notes the defense "might well have been effective in persuading the jury to acquit [Dabas] of murder" and instead convict him of a lesser offense, such as aggravated manslaughter or vehicular homicide.

The panel also observed that, at the time of Dabas's trial, "the Supreme Court had twice expressed its disapproval of the police practice of routinely destroying notes," citing Branch, supra, 182 N.J. at 367 n.10 and Cook, supra, 179 N.J. at 542 n.3. It referred to our more recent decision in W.B., supra, 205 N.J. at 607, in which we stated that we "need not take much

_____

[7] The Appellate Division determined that there was sufficient credible evidence in the record to support the trial court's finding that Dabas's statements were knowingly, intelligently, and voluntarily made to law enforcement officers. We do not review those portions of the Appellate Division opinion that are not relevant to the issue on which we granted certification.

17

time to state, once more, that law enforcement officers may not destroy contemporaneous notes of interviews and observations at the scene of a crime after producing their final reports." The panel rejected the State's argument that W.B. had no applicability to the present case merely because W.B. deferred implementing the requirement that law enforcement retain and disclose contemporaneous notes recording witness statements, citing id. at 608. The panel emphasized that in W.B. this Court stated that its "holding regarding the discovery obligation is merely a reiteration of existing law," quoting ibid. It pointed out that because the defendant in W.B. did not request an adverse-inference charge, he was not entitled to the charge, citing ibid. In contrast, here, the panel noted, defense counsel requested and should have been given the charge because "Dando took extensive notes" of the pre-interview and then used those notes "during the recorded interview to ask a series of questions, many of them leading, that elicited highly incriminatory responses." Accordingly, the panel remanded for a new trial on the murder and lesser-included charges.

This Court granted the State's petition for certification to address the Appellate Division's ruling that Dabas was entitled to an adverse-inference charge and its overturning of his murder conviction. State v. Dabas, 210 N.J. 217 (2012). We

also granted the motion of the Attorney General to participate as amicus curiae.

## III.

### A.

The State urges this Court to reverse the Appellate Division and reinstate Dabas's murder conviction. The State argues that in 2006 -- when Dando prepared his report and destroyed his notes -- "there was no precedent from this Court that required the police to retain their notes." It acknowledges that in both Cook, decided in 2004, and in Branch, decided in 2005, this Court "expressed its disapproval of the prevalent practice among the police to destroy notes after a report was written." However, the State contends that these "footnotes were dicta, and did not constitute precedent." The State acknowledges that in W.B., decided in 2011, the Court ordered that notes of witness statements compiled into final reports must be retained and disclosed by the prosecutor. However, the State maintains that the Court did not intend W.B. to be retroactively applied, otherwise it would not have "ruled that implementation of the retention and disclosure of police notes would be delayed for thirty days in order to allow the State sufficient time to educate police officers." The State also stresses that the defense "could have requested

19

Investigator Dando's notes or moved to have them preserved since it took the investigator until February 2006 to write his report."[8]  The State further contends that because "defendant was present during the pre-interview[,] . . . he could have taken the stand to rebut or challenge" Investigator Dando's account.

B.

The Attorney General, appearing as amicus curiae, presents many of the same arguments advanced by the State and urges that W.B. be given prospective effect to this case.  The Attorney General reasons that "[a]fter Cook and Branch, defense attorneys were on notice not that an officer's notes were necessarily discoverable under Rule 3:13-3, but that they had every right to ask law enforcement to retain such notes."  In that regard, the Attorney General points out that although Investigator Dando's notes existed for eighteen months after the pre-interview, defense counsel did not request them.  In a letter to this Court, the Attorney General admits that, pursuant to Rule 3:13-3, "an officer's notes concerning a defendant's statement or a witness' statement, never incorporated into a report, were discoverable."

---

[8] At oral argument, the Assistant Middlesex County Prosecutor representing the State stated that prior to W.B., for purposes of the discovery rule, the prosecutor's office apparently made no distinction whether notes incorporated into a final report were destroyed before or after an indictment.

The Attorney General makes several additional arguments. He contends that (1) Investigator Dando did not exhibit bad faith in destroying his notes, the notes were not exculpatory and material, and Dabas had the opportunity to challenge the taped statement and Dando's credibility at trial; (2) the failure to give an adverse-inference charge did not likely alter the outcome of the case given the overwhelming evidence of Dabas's guilt; and (3) the trial court's decision not to give an adverse-inference charge did not constitute an abuse of discretion.

C.

In urging an affirmance, Dabas contends that the Appellate Division correctly construed W.B. as reinforcing existing law and not announcing a new rule of law. He asserts that the W.B. Court declined to apply its holding to that case because, unlike here, the defendant did not request an adverse-inference charge. However, even if W.B. announced a new rule of law, Dabas insists that retroactive application of that rule is appropriate, citing State v. Natale, 184 N.J. 458, 493 (2005). Dabas claims that the destruction of the notes denied him an opportunity to persuade the jury to convict him of a lesser offense than murder. He states that "[t]he use of an adverse-inference instruction as a sanction for a discovery violation is not new to the legal arsenal" and that the failure to give that charge

21

in this case was prejudicial.  He concludes that "regardless of whether the Court finds that W.B.'s approval of such a [negative-inference] charge applies retroactively to [his] appeal, it must find that the trial judge's refusal to give the charge constitutes reversible error."

IV.

A.

The Court must resolve several issues of law.  First, we must decide whether the prosecutor's office violated an established discovery rule when its investigator destroyed his notes of the two-hour pre-interview of Dabas.  If there was a violation of the discovery rule, we must then determine whether the trial court was empowered to impose the sanction of an adverse-inference charge.  The Court reviews these legal issues de novo, owing deference to neither the Appellate Division nor the trial court.  See State v. Gandhi, 201 N.J. 161, 176 (2010) ("It is a well-established principle of appellate review that a reviewing court is neither bound by, nor required to defer to, the legal conclusions of a trial or intermediate appellate court.") (citing Toll Bros. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).  On the other hand, if the trial court had the legal authority to give the adverse-inference charge, we must then answer whether the trial court abused its discretion in not

22

doing so.  Marshall, supra, 123 N.J. at 134 ("The choice of sanctions appropriate for discovery-rule violations is left to the broad discretion of the trial court.").

In this case, Investigator Dando destroyed his interview notes more than a year after Dabas's indictment.  Therefore, we must apply to these facts the State's post-indictment discovery obligations and determine whether the State was required to disclose Dando's interview notes to the defense.

B.

"Once an indictment has issued, a defendant has a right to automatic and broad discovery of the evidence the State has gathered in support of its charges."  State v. Scoles, ___ N.J. ___, ___ (2013) (slip op. at 22) (citing Pressler & Verniero, Current N.J. Court Rules, comment 3 on R. 3:13-3 (2013) ("'Defendant's post-indictment right to discovery is automatic.'")).  The State must tender discovery even without a request.  See R. 3:9-1(a) and R. 3:13-3(b); Pressler & Verniero, supra, comment 3.1 on R. 3:13-3(c).  Rule 3:13-3(b) -- entitled post-indictment discovery -- provided:

> A copy of the prosecutor's discovery shall be delivered to the criminal division manager's office, or shall be available at the prosecutor's office, within 14 days of the return or unsealing of the indictment. Defense counsel shall obtain a copy of the discovery from the criminal division manager's office, or the prosecutor's

> office, no later than 28 days after the return or unsealing of the indictment.
>
> [R. 3:13-3(b) (emphasis added).][9]

We have recently characterized "pretrial discovery in criminal matters post-indictment" as "an open-file approach." Scoles, supra, ___ N.J. at ___ (slip op. at 21). The Supreme Court Committee that recommended the version of Rule 3:13-3(b) that was in effect at the time of Dabas's case reported: "The statewide practice is that the prosecutor and defense counsel exchange discovery automatically without a request. Thus, the language requiring discovery only after a request is unnecessary." Recommendations of the Supreme Court Committee on Criminal Practice on Rules Necessary to Implement the Criminal Division Operating Standards, Commentary, 137 N.J.L.J. 54, 95 (May 9, 1994). The prosecutor's obligation to provide discovery within fourteen days of the return of the indictment was self-executing.

We must next consider whether Dando's notes fell within the realm of discoverable material that the prosecutor was required to make available to the defense. For that answer, we turn to the substantive provisions of the discovery rule. Rule 3:13-3(c)(2) and (7) provide:

---

[9] The current version of Rule 3:13-3(b)(1), among other things, requires the State to make discovery available to the defense within seven days of the return or unsealing of the indictment.

24

The prosecutor **shall** permit defendant to inspect and copy or photograph the following relevant material if not given as part of the discovery package under section (b):

. . . .

(2) <u>records of statements or confessions, signed or unsigned, by the defendant</u> or copies thereof, and a summary of any admissions or declarations against penal interest made by the defendant that are known to the prosecution but not recorded;

. . . .

(7) record of statements, signed or unsigned, by such persons or by co-defendants which are within the possession, custody or control of the prosecutor and any relevant record of prior conviction of such persons... .

[(Emphasis added).]

Within the meaning of <u>Rule</u> 3:13-3(c)(2), there is little question that Dando's notes of Dabas's pre-interview statements were "records of statements . . . by the defendant."

In <u>Marshall</u>, <u>supra</u>, this Court imposed severe sanctions on the State for its failure to provide the defense with witness interview notes before trial. 123 <u>N.J.</u> at 133-34. The discovery violation in <u>Marshall</u> came to light during the prosecutor's cross-examination of the defendant. <u>Id.</u> at 133. The defendant was asked whether he had made certain statements to four persons who had been listed as potential trial witnesses. <u>Ibid.</u> Defense counsel objected when it became

25

apparent that "the prosecutor was obviously using interview notes that had not been produced during discovery." Id. at 133-34. We determined that "the trial court correctly ruled that the interview notes were discoverable pursuant to Rule 3:13-3(a)(8)." Id. at 134 (citing R. 3:13-3(a)(8) (1991) (requiring the production of "police reports which are within the possession, custody, or control of the prosecutor")). Although the trial court denied the defendant's mistrial motion, it "precluded the State from using the [interview] notes for further cross-examination and from calling any of the four persons as rebuttal witnesses concerning any subject covered by the interview notes." Ibid. Because the prosecutor's use of the notes during cross-examination did not elicit any prejudicial admissions, we found that "the sanction[s] imposed [were] a proper and measured response to the nondisclosure of the interview notes." Ibid.

Needless to say, contemporaneous notes of a defendant's own statements to law enforcement officers should rank even higher on the scale of importance than witness interview notes. As noted earlier, the Attorney General concedes that, under Rule 3:13-3, "an officer's notes concerning a defendant's statement or a witness' statement, never incorporated into a report, were discoverable." Significantly, in this case, Dabas's pre-interview statements -- recorded in Investigator Dando's notes -

26

- had not been incorporated into a report on December 21, 2004, the day the Middlesex County Grand Jury returned the murder indictment, or fourteen days after the return of the indictment when the prosecutor was required to deliver discovery to the criminal division manager's office or make discovery available in the prosecutor's office. See R. 3:13-3(b). Thus, even by the terms set forth in the Attorney General's letter, the pre-interview notes should have been turned over to the defense. At the time of the prosecutor's mandatory and self-executing disclosure requirements, the notes had not been incorporated into a report. Defense counsel did not have to request discovery that the prosecutor was obliged to produce, nor did defense counsel have to possess the foresight that one of the prosecutor's investigators was withholding interview notes of statements made by Dabas and intended to destroy them.

At trial, the court did not require the prosecutor to explain why interview notes of Dabas's statements that remained in the prosecutor's possession and control until February 2006 -- more than one year following the indictment -- were not given to the defense. In this case, the prosecutor violated the clear rule governing post-indictment discovery.

C.

Because the discovery rule commanded the field in this case, this Court's pre-indictment cases on retention of

27

interview notes are not critical to our analysis.  Suffice it to say, we have repeatedly disapproved of law enforcement officers discarding interview notes before the prosecutor's post-indictment discovery obligations become operative pursuant to Rule 3:13-3(b).

In Cook, supra, a murder case prosecuted by the Middlesex County Prosecutor's Office, the defendant was interrogated multiple times by that office's investigators who did not electronically record the questioning and then destroyed their notes.  179 N.J. at 542-46.  In that case, we noted: "Apparently, once each officer prepared his report, he destroyed his notes from the interrogation sessions, a practice that is apparently common, but one that we disapprove of."  Id. at 542 n.3 (emphasis added).  It bears mentioning that Cook led first to our establishing "a committee to study and make recommendations on the use of electronic recordation of custodial interrogations," id. at 562, and later to a rule that required the electronic recordation of custodial interrogations in cases involving serious offenses, see R. 3:17; Pressler & Verniero, supra, comment on R. 3:17.

In Branch, supra, an investigating detective destroyed his contemporaneous notes of his interview with a child, thus leaving no record of whether the questioning might have been "unintentionally suggestive."  182 N.J. at 366-67.  That

detective and another officer also admitted to discarding their crime-scene notes after completing their reports.  Id. at 367 n.10.  "We register[ed] our displeasure that police officers engage in the seemingly routine practice of destroying their contemporaneous notes of witness interviews after the preparation of formal reports."  Ibid.  Again, we expressly disapproved of this "practice of destroying contemporaneous notes," citing not only Cook, supra, 179 N.J. at 542 n.3, but also People v. Wallace, 565 N.E.2d 471, 472 (N.Y. 1990), which held that police officers are required to preserve their notes.  Branch, supra, 182 N.J. at 367 n.10.

Both Cook and Branch preceded Investigator Dando's decision to destroy his contemporaneous notes of his interview of Dabas.  The prosecutor's office decided that this Court's declarations were mere "dicta" and that it was free to destroy contemporaneous interview notes both before and after indictment.  However, the prosecutor's office is not at liberty to disregard a pronouncement of this Court, even if that pronouncement is properly characterized as dictum.  See State v. Breitweiser, 373 N.J. Super. 271, 282-83 (App. Div. 2004) ("[A]s an intermediate appellate court, we consider ourselves bound by carefully considered dictum from the Supreme Court."), certif. denied, 182 N.J. 628 (2005); Barreiro v. Morais, 318 N.J. Super. 461, 468 (App. Div. 1999) ("We recognize these rulings are

29

dictum.  Nonetheless, we consider ourselves bound by them.");

Kenney v. Scientific, Inc., 204 N.J. Super. 228, 247 (Law Div.

1985) ("Whether dictum or not, it is such a strong statement of

underlying social policy by the State's highest court that a

trial judge should not arrogate unto himself the right to

disregard it.").  Appellate and trial courts consider themselves

bound by this Court's pronouncements, whether classified as

dicta or not.  That any prosecutor's office would disregard this

Court's express disapproval of the practice of destroying

contemporaneous interrogation notes on the ground that the

Court's words are dicta is deeply troubling.  Nevertheless, the

prosecutor's obligation to abide by Rule 3:13-3(b) in the post-

indictment setting, which includes the production of interview

notes, is not dicta.

In W.B., supra, we made clear that the destruction of

interview notes, even before the return of an indictment, would

leave prosecutor's facing a potential adverse-inference charge.

205 N.J. at 607-09.  In W.B., we observed:  "We need not take

much time to state, once more, that law enforcement officers may

not destroy contemporaneous notes of interviews and observations

at the scene of a crime after producing their final reports."

Id. at 607 (emphasis added) (citations omitted).  We set forth

the obvious policy reasons for retention of interview notes:

30

> [T]he possibility of a misrecording is precisely why the notes must be maintained -- a defendant, protected by the Confrontation Clause and our rules of discovery, is entitled to test whether the contemporaneous recording is accurate or the final report is inaccurate because of some inconsistency with a contemporaneous recordation. It is for the jury to decide the credibility of the contemporaneous or other recordation made while an investigation is on-going prior to preparation of a formal report.
>
> [Id. at 607-08.]

In W.B. we stated that "our holding regarding the discovery obligation is merely a reiteration of existing law." Id. at 609. Nonetheless -- out of an abundance of caution -- we deferred implementation of the note-retention "requirement for thirty days in order to allow prosecutors sufficient time to educate police officers." Id. at 608. After the thirty-day period, we held that "if notes of a law enforcement officer are lost or destroyed before trial, a defendant, upon request, may be entitled to an adverse inference charge." Ibid.[10] We clearly signaled that the note-retention requirement would apply prospectively to pre-indictment cases beginning after the thirty-day grace period in W.B. We therefore disagree with the Appellate Division that W.B. retroactively applies to or otherwise governs this case.

---

[10] In W.B. the defendant did not request an adverse-inference charge before jury instructions, and therefore we held he was not entitled to the instruction. W.B., supra, 205 N.J. at 609.

31

Cook, Branch, and W.B. addressed a problem not covered by Rule 3:13-3(b) and (c) -- the retention of notes until indictment when the prosecutor's obligation of disclosure becomes mandatory and self-executing. Those three cases were gap-fillers. This case, in contrast, is governed squarely by the discovery rule. Under Rule 3:13-3(b), the prosecutor's office did not have discretion to withhold interview notes in its file after the return of the indictment. Those notes should have been disclosed to the defense. Instead, they were destroyed more than one year after the return of the indictment by an investigator who, in his report, concluded that Dabas was guilty of murder.

### D.

The danger of Investigator Dando destroying his contemporaneous interview notes of August 25, 2004 -- leaving no record of what he included in his final report -- should be self-evident. When Dando completed his final report in February 2006, the indictment against Dabas had been returned one year earlier and the prosecutor's office was set to try Dabas for murder. Dando expressed the view in his final report that Dabas was guilty of murder. Incorporating notes into a report is not necessarily a process of cutting and pasting. The words in the interview notes were filtered through an investigator who, understandably, had developed a distinct view of the case. The

32

potential for unconscious, innocent self-editing in transferring words, sentence fragments, or full sentences into a final report is a real possibility.  So is the potential for human error in the transposition of words from notes into a report.  The meaning and context of Dabas's words as recorded in the notes may have been subject to differing interpretations where Dando saw only one.  Language nuances may have been lost as Dando translated them into the final report.  The slightest variation of a word or a phrase can either illuminate or obscure the meaning of a communication.  See State v. Kociolek, 23 N.J. 400, 421-22 (1957) ("'Verbal precision is of course important to the correct understanding of any verbal utterance, whether written or oral, because the presence or absence or change of a single word may substantially alter the true meaning of even the shortest sentence.'" (quoting Wigmore, Evidence, §§ 1056, 2094)); see also Model Jury Charge (Criminal), "Statements of Defendant" (June 14, 2010), available at http://www.judiciary.state.nj.us/criminal/charges/non2c024a.pdf.

By destroying his notes, Dando made himself the sole judge of what actually was contained in his contemporaneous notes. Dando all but admitted that the use of leading questions -- and monosyllabic answers by Dabas -- permitted a neat and coherent narrative of the events in the mall parking lot.  The leading-question technique, according to Dando, did not allow Dabas to

33

"go back to being evasive," a suggestion that the pre-interview narrative was not so neat and coherent. If there were differences between the notes and the final report, Dabas had a right to present them to the jury in his defense to the murder charge.

V.

Sanctions for violating the discovery rule are set forth in Rule 3:13-3(g). The sanction rule provides:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, <u>it may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate.</u>

> [R. 3:13-3(g) (emphasis added).] [11]

An adverse-inference charge is one permissible remedy for a discovery violation, such as the destruction of interrogation notes that should have been turned over to the defense. See, e.g., W.B., supra, 205 N.J. at 597, 609 (holding "an adverse

---

[11] The 2013 amendment to Rule 3:13-3 redesignated paragraph (g) as paragraph (f) and, among other things, removed the language "or inspection" from paragraph (g).

34

inference charge may be given when a police officer destroys his or her investigatory notes before trial").

The adverse-inference charge is a remedy to balance the scales of justice, even outside of the realm of a discovery violation. For example, a defendant may be entitled to such a charge if the State fails to present a witness who is within its control, unavailable to the defense, and likely to give favorable testimony to the defendant. See State v. Clawans, 38 N.J. 162, 170-75 (1962). The failure to present the witness might "raise[] a natural inference that the [State] . . . fears exposure of those facts would be unfavorable to [it]." Id. at 170.

The same logic applies, perhaps with even greater force, to the destruction of interrogation notes in the post-indictment stage. See Zenquis, supra, 251 N.J. Super. at 370 ("[I]f [the jury] found [the investigating officer] destroyed his notes at a time when he knew the case was proceeding to trial, it could infer that the notes contained information inconsistent with the witness's trial testimony.").[12] Dabas did not seek to suppress

---

[12] The criminal adverse-inference charge is analogous to the spoliation inference which may be drawn when evidence has been concealed or destroyed in civil cases. The spoliation inference -- like the adverse-inference charge -- "allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her." Rosenblit v. Zimmerman, 166 N.J. 391, 401-02, 407 (2001). The spoliation inference follows from a centuries-old

Dando's testimony about the pre-interview.  Instead, his counsel

requested an adverse-inference charge as the remedy for the

destruction of Dando's notes.  Under the circumstances of this

case, the trial court abused its discretion by not giving that

charge.

Balancing the scales required the court to instruct the

jury that the State had a duty to produce the pre-interview

notes to the defense following the return of the indictment.

Because the State made the notes unavailable, the court should

have advised the jury that it was permitted to draw an inference

that the contents of the notes were unfavorable to the State.

Whether to draw such an inference falls within the jury's

discretion, after it gives full consideration to the nature of

the discovery violation, the explanation given by the State for

the violation, and any other relevant factors that would bear on

the issue.

VI.

A.

In light of the clear violation of the discovery rule and

the probable prejudice caused to Dabas by the destruction of the

---

rule followed by courts:  "'omnia praesumuntur contra
spoliatorem,' which means 'all things are presumed against the
destroyer.'"  Id. at 400-01 (citations omitted).

36

interview notes, we conclude that the trial court abused its discretion by not giving the adverse-inference charge.  We agree with the Appellate Division "that there was a realistic potential that Dando's contemporaneous notes could have assisted defense counsel in challenging Dando's testimony" and the integrity of the tape-recorded statement.  We also agree with the Appellate Division that "much of the direct evidence of Dabas's intent and state of mind came from Dando's testimony about the unrecorded pre-interview interrogation and the recorded statement based largely on leading questions."

Dando's credibility was a critical factor in determining whether Dabas was guilty of murder or some lesser offense, such as aggravated manslaughter or manslaughter.  The jury should have been told that the prosecutor's office was required under the discovery rule to provide Dabas with the pre-interview notes and that their destruction allowed it to draw an inference that the notes would have been favorable to the defense.

We cannot say that such a charge would not have altered the outcome of the jury's verdict.  The failure to give the charge was "clearly capable of producing an unjust result."  R. 2:10-2.

B.

For the reasons expressed, we affirm the Appellate Division's reversal of Dabas's murder conviction and remand for a new trial.

CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA and PATTERSON, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion.  JUSTICE HOENS did not participate.

SUPREME COURT OF NEW JERSEY

NO.   A-109                     SEPTEMBER TERM 2011

ON CERTIFICATION TO      Appellate Division, Superior Court

STATE OF NEW JERSEY,

       Plaintiff-Appellant,

           v.

SAMANDER S. DABAS,

       Defendant-Respondent.

DECIDED       July 30, 2013

             Chief Justice Rabner            PRESIDING

OPINION BY      Justice Albin

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY

| CHECKLIST | AFFIRM AND REMAND | |
|-----------|-------------------|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |