STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. LILLIAN CLAWANS, DEFENDANT-APPELLANT.

Argued May 22, 1962—Decided July 3, 1962.

*Mr. Jerome C. Eisenberg* argued the cause for defendant-appellant (*Mr. Stuart L. Pachman* and *Mr. Jerome C. Eisenberg,* on the brief, *Messrs. Clapp & Eisenberg,* attorneys).

*Miss June Strelecki,* Assistant Prosecutor of Essex County, argued the cause for plaintiff-respondent (*Mr. Peter Murray,* Assistant Prosecutor, of counsel and on the brief, *Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney).

The opinion of the court was delivered by

HANEMAN, J. Defendant appeals from a conviction of subornation of false swearing.

The false swearing for subornation of which defendant, a member of the bar of this State for 38 years, was indicted, arose from the contradictions between facts contained in a sworn statement to the police made by Barbara Holmes concerning one Booker Drinkard and her sworn testimony at Drinkard's preliminary hearing.

Holmes, a narcotic addict, was arrested on April 8, 1960 for possession of narcotics. On April 11 she signed a sworn statement in question and answer form. In response to the question "* * * Will you now tell us how you came to have this suspected heroin in your possession?" she answered, "I obtained it from Booker Drinkard."

Drinkard, the father of several children by Lessie Davis, Holmes' aunt, was arrested on the basis of this statement and on May 26 was accorded a preliminary hearing in the Newark Municipal Court. Defendant was his attorney. Holmes, who had been in jail since her arrest, was brought to court at approximately 11:00 A. M. to appear as a witness against Drinkard. She and another prisoner, Irene Baker, together with Mrs. Gant, a matron from Caldwell Penitentiary, sat on a bench in front of the magistrate.

Drinkard's case was called for trial on that afternoon. Holmes, having been sworn, testified that "I myself obtained the drugs in New York and at the time I gave that statement [of April 11] I was under the influence of narcotics." In answer to the direct question of whether she had gotten the drugs from Drinkard she replied in the negative. Because of the contradictory testimony given at Drinkard's trial, Holmes was indicted for false swearing and pleaded guilty in October 1960.

On defendant's trial Holmes testified that: Defendant came over to speak to her on three occasions on the morning of May 26. The first time, defendant said, "Booker Drinkard wants to know if you will say you got the drugs in New York and that you were under the influence of narcotics." Holmes said she replied, "I know what I am going to say." The second time, defendant made essentially the same statement. Holmes did not answer. The third time, according to Holmes, defendant "said that Booker said if I would say that I got the drugs in New York he would see that I got a lawyer or he would do all he could for me." This time Holmes directed defendant to tell Booker not to worry. Defendant told her that Drinkard would do "whatever he can for me [her]." During each of the conversations, Holmes said, defendant knelt beside her for approximately five seconds.

Holmes' explanation of the reason for her testimony on May 26, as given at defendant's trial, was "Because I know the type of fellow that Booker Drinkard is. I know

he has a way of getting out of jail, out on bail. He manages to get out. I was afraid what he might do to my aunt because of me if I would put that statement on that."

Monahan and Howard, two detectives who had arrested Holmes and who had been present in court to testify at Drinkard's hearing, both partially corroborated Holmes' story. Monahan, who had been 10 to 15 feet from Holmes, testified that although unable to hear any conversation, he did see defendant talking to Holmes before the Drinkard case was called. Howard, who was 20 or 25 feet away, saw defendant twice speak to Holmes. Of the conversations he only heard Holmes say to defendant on the second occasion, "Tell him not to worry."

The State called neither Mrs. Gant nor the prisoner, Baker. None of the other witnesses called who had been present in the courtroom during the Drinkard hearing could remember seeing defendant speak to Holmes.

Holmes testified further that after she had agreed to change her testimony she immediately informed Drinkard of her desire to have as attorney Leon Lavigne, a lawyer who knew her family and who had previously represented her. Lavigne testified that he had been in municipal court on May 27, 1960, the day Holmes was arraigned for false swearing, but that he was in attendance on other cases, having no previous knowledge of Holmes' presence. As he was about to pass the prisoners' bench she called to him. When he turned to speak to her, he testified, defendant came over and said to Holmes: "I told you Mr. Lavigne was going to be here and here he is and he will take good care of you." Although he was puzzled by this remark Lavigne then acceded to a request by Holmes to help her and he entered a plea of not guilty to the charge of false swearing arising out of her testimony on the prior day. As before noted, this plea was subsequently changed to guilty in October. Later that day, Lessie Davis spoke to Lavigne in the corridor outside the courtroom in the presence of defendant, who suggested at that time that he make an

appointment with the aunt. An appointment was made for that afternoon at which time Lavigne informed the Davis woman he would not represent her niece.

Within a week the following occurred between him and defendant: "I met Miss Clawans in the hall of Judge Castellano's court. There is a big hall outside of Part 1, and this was in the morning, either the following Monday or Tuesday morning. And she said to me, 'Aren't you going to represent Barbara Holmes?' I said, 'No.' She said, 'Why not? She is a very sweet girl, a very nice girl.' I said to Miss Clawans, 'If she is such a nice sweet girl you represent her.' She said, 'Well, I can't represent her.' I said, 'If you can't, I won't.'"

Defendant testified that she had gone to see Drinkard in jail on the night of his arrest, May 24, but had not decided when she left whether to represent him, in part because his ability to pay was questionable. William Lindner, who was in charge of the jail, was called by the State in rebuttal and testified Drinkard had given defendant $55 that night. Defendant further testified that she was not in the courtroom at any time on the morning of May 26, stating that she arrived in the afternoon after the Drinkard hearing had been called. She denied having talked to Holmes on May 26 prior to the Drinkard trial.

The jury returned a verdict of guilty from which defendant appealed to the Appellate Division. Before argument there we certified on our motion. See *R. R.* 1:10–1(a).

Defendant argues that (1) the trial court erred in admitting into evidence Holmes' sworn statement of April 11, 1960 and permitting the exhibit to be in the jury's possession during its deliberation; (2) the State's summation was prejudicial; (3) the indictment was defective; (4) defendant's motion at the end of the State's case should have been granted since there was no proof of defendant's knowledge of the false swearing; (5) the trial court erred in refusing to charge a request that certain particularized

inferences favorable to defendant could be drawn from the failure of the State to call Irene Baker and Mrs. Gant.

## I.

Defendant argues that not only did the court err in admitting the Holmes sworn statement into evidence, but also in permitting that statement to be in the possession of the jury during its deliberations.

 To maintain its case against defendant the State must prove not only that she asked Holmes to swear falsely but that Holmes did in fact do so. The commission of the crime of false swearing by Holmes was an essential element in the State's proof against this defendant for subornation. *State v. Moffa*, 36 *N. J.* 219 (1961). The sworn statement was evidential in resolution of that issue for it demonstrated a variance with the oral testimony given at the Drinkard hearing. Having been properly accepted into evidence for this purpose, the jury was entitled to take the statement into the jury room for its consideration during deliberations. 5 *Wharton, Criminal Law & Procedure*, § 2113 (1957).

## II.

Defendant argues that a portion of the State's summation was prejudicial. No such objection was made at trial but defendant now urges that the summation constituted "plain error" and therefore that a reversal of the judgment of conviction is required. See *State v. Hipplewith,* 33 *N. J.* 300 (1960); *R. R.* 1:5–1(a).

The language to which defendant now objects is as follows:

"Finally, where was Booker Drinkard? Booker Drinkard was arrested, taken into custody on the testimony of Barbara Holmes. The State has no duty to produce hostile witnesses. The State has no duty to produce witnesses that are going to say what their attorney wants them to say. * * *."

The reference to Drinkard was made in reply to defendant's summation to the jury wherein it was argued that he was an essential witness for the State's case and yet was not called. In view of this, it was proper for the State to make some comment on the reason for not calling him as a witness. It was, of course, improper for the State to suggest that if called, Drinkard would also be suborned by defendant. As noted above, no objection was taken to the summation at the trial. We need not say whether the prosecutor's statement, of itself, constituted plain error warranting reversal, but we are satisfied this erroneous statement, together with the matter in $V$ below, require a new trial. *State v. Orecchio,* 16 *N. J.* 125 (1954).

### III AND IV.

We find no merit at all in the third and fourth grounds urged for reversal by defendant and, therefore, direct no additional comment to them.

### V.

Defendant argues that the trial court committed reversible error in refusing to deliver the following charge requested by her:

"32. The jury may further infer that from the failure on the part of the State to produce Irene Baker, a prisoner, and Mrs. Gant, the jail matron with whom Barbara Holmes was sitting on the prisoners bench in the Police Court on May 26, 1960, supports an inference that there was no conversation between Barbara Holmes and defendant, Miss Lillian Clawans, at the time and place, and that no such conversation ever took place."

Generally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him. 2 *Wigmore, Evidence,* § 285 (3*d ed.* 1940). But such an inference cannot arise except upon certain condi-

tions and the inference is always open to destruction by explanation of circumstances which make some other hypothesis a more natural one than the party's fear of exposure. This principle applies to criminal as well as civil trials, to the State as well as to the accused. *Id.* §§ 285, 290. See *State v. Cooper,* 10 *N. J.* 532, 566 (1952); *State v. Elliott,* 129 *N. J. L.* 169 (*Sup. Ct.* 1942), aff'd o. b. 130 *N. J. L.* 174 (*E. & A.* 1943); *State v. Callahan,* 76 *N. J. L.* 426 (*Sup. Ct.* 1908).

For an inference to be drawn from the nonproduction of a witness it must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved. *Meistrich v. Casino Arena Attractions, Inc.,* 54 *N. J. Super.* 25, 31 (*App. Div.* 1959), modified 31 *N. J.* 44 (1959); *O'Neil v. Bilotta,* 18 *N. J. Super.* 85, 86 (*App. Div.* 1952); 2 *Wigmore, op. cit., supra,* §§ 286, 287.

For obvious reasons the inference is not proper if the witness is for some reason unavailable or is either a person who by his position would be likely to be so prejudiced against the party that the latter could not be expected to obtain the unbiased truth from him, or a person whose testimony would be cumulative, unimportant or inferior to what had been already utilized. *State v. DePaola,* 5 *N. J.* 1 (1950); *Pawlowski v. Marino,* 71 *N. J. Super.* 120 (*App. Div.* 1961); *O'Neil v. Bilotta, supra,* at *p.* 86; 2 *Wigmore, op. cit., supra,* §§ 286, 287. The failure to call a witness available to both parties has been said to preclude the raising of an inference against either. *O'Neil v. Bilotta, supra,* at *p.* 86. However, the more logical approach views this situation as posing a possible inference against both, the questions of the existence and strength of the inference against either being dependent upon the circumstances of the case, including whether one party has superior knowledge of the identity of the witness and what testimony might be expected from him, as well as the relationship of

the witness to the parties. 2 *Wigmore, op. cit., supra,* § 288. See *Michaels v. Brookchester, Inc.,* 26 *N. J.* 379, 391 (1958); *Pawlowski v. Marino, supra,* at *p.* 126; 2 *Wigmore, op. cit., supra,* § 288.

▪ Application of the above principles is particularly perplexing and difficult where a litigant requests a charge to that effect. Such request normally comes at the conclusion of the entire case without warning to the opposition. The allegedly defaulting party is not accorded an opportunity to justify or explain his failure to call the witness. It is conceivable that the factual situation involved in the litigation and the relationship of the parties to the witnesses, are such that the trial judge may properly reach a conclusion as to whether an inference could arise without the necessity of proof in explanation and therefore without prior warning of the intention to request a charge. The better practice, however, is for the party seeking to obtain a charge encompassing such an inference to advise the trial judge and counsel out of the presence of the jury, at the close of his opponent's case, of his intent to so request and demonstrating the names or classes of available persons not called and the reasons for the conclusion that they have superior knowledge of the facts. This would accord the party accused of nonproduction the opportunity of either calling the designated witness or demonstrating to the court by argument or proof the reason for the failure to call. Depending upon the particular circumstances thus disclosed, the trial court may determine that the failure to call the witness raises no inference, or an unfavorable one, and hence whether any reference in the summation or a charge is warranted.

The State urges that the prosecutor has a wide discretion in deciding what evidence to adduce. It refers to *State v. Murphy,* 36 *N. J.* 172, 178 (1961), where Chief Justice Weintraub said:

"A prosecutor may sensibly decide for various reasons not to use evidence which could advance the State's case. For example, a 'confession or other proof which the State does not need may raise

distracting issues or unduly extend the trial or invite claims of prejudice; or the offer may disclose material which can harm the State in another matter; or the identity of an informer may needlessly be revealed. We have suggested enough to demonstrate the need for discretion in the prosecutor. He does not have a peremptory duty to use all available evidence to support the charge. And surely, if a court should undertake to review the prosecutor's decision in such matters, it must know the reasons for his decision and weigh them against the contribution the evidence could make in the case."

The issue in *Murphy* was whether the trial court could compel the prosecutor to use evidence favorable to the State. The duty of the prosecution to reveal or adduce evidence favorable to the defense is another matter, (see 7 *Wigmore, op. cit., supra,* §§ 2079, 2080), as also is the question before us, whether an unfavorable inference may be drawn from the failure of the State to call one of its employees who was so situated at the time of the alleged offense as to be a likely source of information.

We come, therefore, to the particular request here made. ▮ Defendant directs the thrust of her argument in support of the request, toward the failure to call Mrs. Gant. At no point in this appeal does she argue that any inference could arise from the failure to call Irene Baker. The availability of Mrs. Gant is admitted by the State. It was stated by the prosecutor at oral argument that the reason for not having called her as a witness lay in the fact that her testimony would have been cumulative, thus admitting by implication that she had knowledge of the crucial facts.

It is easily conceivable that the State would have a meritorious reason for not calling Irene Baker, who stood charged with crime on the day of the alleged conversation of Holmes and defendant. Nor does defendant argue that the requested charge was proper insofar as an omission to call Baker is concerned, impliedly admitting thereby the error in including her in the request. She does, however, insist that the failure to call Mrs. Gant gave rise to an inference favorable to the defense.

Mrs. Gant was a matron employed in the Caldwell Penitentiary. As such she should be considered a member of the law enforcing agency of the county and hence it is reasonable to conclude that she is not prejudiced against the State. During all of the conversations which form the bases of the charge against defendant, she sat right beside Holmes and was in a position to observe defendant's conduct and overhear the discussions between defendant and Holmes. Except for Holmes and Baker, no one had a better opportunity to know what actually transpired. She was or could have been an eyewitness to the entire transaction—a status which could make her testimony superior to that of anyone except Holmes. Although her testimony might have been identical with that of Holmes it cannot be considered cumulative in the sense of being unnecessarily redundant. It would better be termed corroborative.

The factual situation here present is most unusual. The defendant had the right as counsel for Drinkard to attempt to converse with Holmes, the person allegedly suborned, in order to obtain her version of the facts. A slight change in the words attributed to defendant would render them susceptible of a construction consistent with such a purpose. Holmes, the sole witness to testify in detail, had a criminal record and her credibility was unusually vulnerable to attack. Mrs. Gant, whose probity is not questioned by the State, became a vital witness who could have corroborated the incident. Absent an explanation other than that her testimony would have been cumulative, defendant was entitled to request a charge that the jury could infer that Mrs. Gant's testimony would have been unfavorable to the State had she been called.

In the form offered, however, the language of the requested charge was entirely too broad and the judge properly refused to so charge. This broadness arises not only because of the inclusion therein of Irene Baker. As before stated, the extent of the inference, if one is merited, goes only so far as to permit the characterization of the

absent testimony as unfavorable to the defaulting party. This is a far cry from the interpretation sought by defendant in her request. Nevertheless, even though the court properly denied the request and ordinarily would have no obligation to correct the charge—*State v. Reilly,* 89 *N. J. L.* 627 (*E. & A.* 1916); *State v. McNair,* 59 *N. J. Super.* 453 (*App. Div.* 1960), cert. den. 365 *U. S.* 829, 81 *S. Ct.* 715, 5 *L. Ed.* 2d 706 (1961), there were peculiar facts here which warranted the molding of the charge to express the proper inference. The aggregate of the prosecutor's summation, discussed above, and the failure to charge the proper inference rendered the trial prejudicial to defendant. *State v. Orecchio, supra.*

Reversed and remanded for retrial.

FRANCIS, J. (dissenting in part). I concur in the result announced by the court but cannot agree with what appears to be the principal reason advanced for reaching the result.

The reversal is predicated largely on the failure of the trial court to remold an improper request to charge submitted by defendant on an *incidental* aspect of the case, and submit the corrected request to the jury. There is not a case to be found in New Jersey which imposes any such burden. On the contrary, and with good reason, the law has always been otherwise.

We are not dealing here with a request to instruct the jury concerning an essential element of the crime charged against the defendant, which the trial judge has failed to cover in his main charge. A mandatory duty exists on the part of trial courts to advise the jury with respect to the fundamental principles of law which control the case being tried. The obligation exists without regard to whether a valid or legally incorrect request to charge is presented. In fact, even an oral request in most general terms, for example, to define the crime alleged or its essential elements, made at the conclusion of the instructions must be honored. *State v. Butler,* 27 *N. J.* 560, 594 (1958). But

that positive duty had never been applied to issues incidentally in the case, such as possible adverse inferences to be drawn by a jury from failure of a party to a suit or indictment to produce certain witnesses. If instructions are desired on *collateral or incidental matters,* they must be made the subject of specific written requests by the interested party. *R. R.* 4:52–1. In absence thereof, the court has no affirmative obligation to deal with the law relating to such phases of the case. 5 *Wharton, Criminal Law and Procedure* (1957) § 2090, *pp.* 257, 258.

Moreover, it is the burden of the attorney to prepare requests to charge in such fashion that they correctly state the law. When that is done, the requests must be complied with if the matter to which they relate is a factor for consideration by the jury. The court, however, is not bound to follow the precise language employed by counsel. He may state the principle involved in his own words so long as there is no material departure from the theme. It is common, and, I think, the better practice, for trial judges to integrate requests into their main charge. Such procedure makes for better treatment of the issues in the case, and facilitates understanding by the jury.

But if a request incorrectly states the law or is partly correct and partly incorrect, the trial judge is, of course, justified in rejecting it. *State v. Firth,* 103 *N. J. L.* 275, 279 *(Sup. Ct.* 1927); *State v. Reilly,* 89 *N. J. L.* 627, 629 *(E. & A.* 1916); *State v. Harrington,* 87 *N. J. L.* 713, 715, 716 *(E. & A.* 1915); *State v. Herron,* 77 *N. J. L.* 523 *(E. & A.* 1908); *Wharton, supra,* § 2094, *pp.* 262, 263; 23A *C. J. S., Criminal Law,* § 1334. If the subject is in the case incidentally, in his discretion he may revise or remodel the request and then include the correct statement in his charge. Failure to do so, however, is not ground for reversal; he is under no duty to pick out the good part and charge it, and reject the bad part. Nor is he under any obligation to rewrite a requested instruction or to correct erroneous statements contained in it. As

the Court of Errors said in *Hoffman v. Trenton Times*, 125 *N. J. L.* 450, 453 (*E. & A.* 1940):

"We perceive no error in the trial court's refusal to charge the request as submitted. It has been held that 'A request must stand or fall by the language in which it is presented to the court *unless modified by counsel.* If a modification of such language, however slight, is required, in order to entitle the party, as a matter of strict right, to have his request charged, it is not error to refuse to charge such request. The reversal of a judgment for the failure of the court to so modify a request that it would be error not to charge it, is a thing yet to be heard of.'" (Emphasis the court's)

And see to the same effect, *Gimbel v. Laird & Co.*, 119 *N. J. L.* 170, 173 (*E. & A.* 1937); *Manchester B. & L. Ass'n v. Allee*, 81 *N. J. L.* 605, 611 (*E. & A.* 1911).

It is a matter of common knowledge that just before summation of counsel the trial judge is frequently handed multiple requests to charge covering many typewritten pages. See *R. R.* 4:52–1. (In this case 40 requests were submitted.) He examines them and generally undertakes to integrate the correct ones into the framework of his charge. If they refer to fundamental elements of the case, he knows the subject must be covered in his instructions, irrespective of the phraseology employed by counsel, and so he is not too much concerned with the accuracy of that type of requests. But if some of them relate to *collateral* matters and incorrectly state the law thereon, he is justified in discarding them and usually does so unless in his discretion, conscious of the atmosphere of the case, he feels that in fairness he should make necessary corrections and instruct the jury accordingly. Whether that course should be followed or the improper requests rejected, has always been regarded as within the judgment of the trial court, and I know of no instance where a court has been reversed for rejecting a request containing an improper statement of the law, or for failing to correct it and give it to the jury as refashioned. And in this case, where a strikingly thorough and fair charge was delivered to the jury, I can see no just cause for departing from the established rule.

I do agree, however, that a new trial is warranted, but only because plain error was committed in the summation of the State. The Special Assistant Prosecutor said to the jury:

"Finally, where was Booker Drinkard? Booker Drinkard was arrested, taken into custody on the testimony of Barbara Holmes. The State has no duty to produce hostile witnesses. *The State has no duty to produce witnesses that are going to say what their attorney wants them to say.* * * *." (Emphasis added)

This statement was unfair and prejudicial and possessed a clear capacity to bring about an unjust result. *State v. Corby,* 28 *N. J.* 106, 108 (1958). The defendant was being tried for allegedly suborning false swearing. Resolution of the issue of guilt or innocence depended upon a difficult evaluation of her credibility. In that atmosphere the representative of the State, cloaked in the prestige of his office, suggested (so the jury could infer) by the quoted assertion that it would be futile for him to call Drinkard because defendant would suborn him too.

HALL, J., concurs in this dissent.

FRANCIS and HALL, JJ., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.