**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1961-14T2
          A-2103-14T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

   Plaintiff-Respondent,

v.

P.E. and S.M.,

   Defendants-Appellants,

and

T.T. and E.H.,

   Defendants.

_____

IN THE MATTER OF S.T., N.E. and
L.T.,

   Minors.

_____

   Argued May 8, 2017 — Decided May 15, 2017

   Before Judges Sabatino, Haas and Geiger.

   On appeal from Superior Court of New Jersey,
   Chancery Division, Family Part, Union County,
   Docket No. FN-20-12-12.

Thomas G. Hand, Designated Counsel, argued the cause for appellant P.E. (Joseph E. Krakora, Public Defender, attorney; Mr. Hand, on the briefs).

Joseph F. Kunicki, Designated Counsel, argued the cause for appellant S.M. (Joseph E. Krakora, Public Defender, attorney; Mr. Kunicki, on the briefs).

Alicia Y. Bergman, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Jane E. Kutch, Deputy Attorney General, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Fratz, on the brief).

PER CURIAM

In these consolidated appeals, defendant P.E.[1] appeals from a March 5, 2012 Family Part order[2] determining that he sexually abused his eleven-year-old stepdaughter S.T. ("Samantha") on a number of occasions over a six-month period between August 2010 and February 2011. Defendant S.M., who is P.E.'s wife, also appeals from the portion of the March 5 order, which found that S.M. abused or neglected Samantha by permitting P.E. to re-enter

---

[1] We use initials and fictitious names to protect the privacy of the family.

[2] This order became appealable as of right after the trial court entered a final order terminating litigation on November 12, 2014.

the home and have contact with Samantha, and her two siblings, N.E. ("Nora") and L.T. ("Lori"), in violation of a safety plan that S.M. entered with the Division of Child Protection and Permanency ("Division") in order to protect the children from P.E. We affirm.

I.

We derive the following facts from the record developed at the fact-finding hearing. P.E. and S.M. are married. S.M. is the biological mother of Samantha, born in September 1999, and Lori, born in October 2001. P.E. is the biological father of Nora, born in May 2000.

On March 22, 2011, the Division received a referral from Samantha's school that alleged that P.E. had sexually abused Samantha. The child disclosed the abuse to two of her classmates after participating in a "Touching Safety Program" at the school. Samantha's classmates told a teacher, who reported the allegation to the principal. Samantha told the school officials that P.E. had started touching her in a sexual manner prior to the start of the current school year. Samantha also stated that P.E. warned her that if she told anyone that he touched her, S.M. would throw P.E. out of the house and the family would have no food to eat.

That same day, Tamekia Chatman, a Division investigator, went to Samantha's home to interview her and S.M. Chatman testified

that Samantha asserted that on at least ten occasions between August 2010 and February 2011, P.E. fondled her breasts and touched her vagina. P.E. touched the child with his hands, his penis, and also with his lips. The child stated that she told P.E. to stop, but the assaults continued over a six-month period.

Samantha told Chatman that the assaults usually happened in P.E.'s bedroom. Sometimes S.M. and the other children were home when the incidents occurred and sometimes they were not. Usually, P.E. would tell Samantha that he "needed help with something" in his room and, once she entered, he would "lay her down" and fondle her, or touch her while she was standing.

Samantha stated that the P.E.'s final assault occurred on the last Sunday of February 2011. On that date, P.E. pulled the child's pants down and put his lips on her body.

Chatman spoke to the two other children. Both denied ever being assaulted by P.E. or witnessing him assault their sister.

Before Chatman arrived at the home, Samantha's school had advised S.M. of the child's allegations. S.M. told Chatman that she confronted P.E., who started crying. However, S.M. stated that P.E. then denied the allegations. Nevertheless, S.M. agreed to keep P.E. out of the home and away from the children until the Division completed its investigation.

Chatman learned from Samantha's school that the child was a "gifted student." However, after she disclosed P.E.'s actions, the school reported that Samantha's "[s]tandardized test scores" dropped off.

On March 22, 2011, Chatman accompanied Samantha to the prosecutor's office, where the child was interviewed by Detective Sofia Santos. Although Detective Santos did not administer a formal "oath" to Samantha, the detective asked the child several times whether she knew the difference between the truth and a lie and whether she would be truthful during the interview. Samantha agreed to tell the truth.

In the interview that followed, Samantha provided an account of P.E.'s actions that was virtually identical to the ones she previously gave to school officials and Chatman. The child's responses as to when the abuse began, what occurred during these incidents, and the last assault in February 2011 were consistent with her prior disclosures. Detective Santos videotaped the interview, and the Division played the DVD during the fact-finding hearing.

Detective Santos also interviewed S.M.[3] S.M. stated that when she questioned Samantha, the child initially told her that P.E. would squeeze her too tight when "he held her." However, Samantha later told S.M. that P.E. had been touching her in an inappropriate manner.

Detective Santos next spoke with P.E., who denied ever assaulting Samantha. However, P.E. did admit that because Samantha was "the one that helps us with the computer[,]" which he kept in his room, he would ask the child to come into his room to assist him with the device. P.E. also stated that he was home sick with the child on the day in February 2011 when Samantha asserted the final assault occurred.[4]

On April 7, 2011, Dr. Gladibel Medina, who was qualified at the hearing as an expert in pediatrics "with . . . specialized knowledge about child sexual abuse," examined Samantha. The child again gave a consistent account of what transpired between P.E. and herself. Samantha "described hand contact of her breast region, oral contact of her breast region, hand contact of her

---

[3] S.M. told the detective that she could read, write, and understand the English language and had a bachelor's degree in social services.

[4] After the interview was completed, the police arrested P.E. on outstanding traffic warrants, but he was not charged in connection with assaulting Samantha at that time.

front genital area and penis contact of her front genital area by [P.E.] on multiple occasions over the past year."

Dr. Medina found no evidence of physical injury or trauma. However, the child described the "emotional stress" she felt because of P.E.'s actions and because "she didn't want to hurt" S.M. Although Dr. Medina noted that Samantha was "tr[ying] to act as normal as possible, . . . her stress gave her difficulties concentrating and also sleeping[.]"

Dr. Medina also opined that the fact that P.E. threatened that the family would suffer if Samantha told anyone what he was doing, was "significant" and that the stress the child was under was "the most common presentation in children who have been abused." Dr. Medina further stated that Samantha's emotional difficulties could "present as school performance or behavioral problems[.]" Dr. Medina recommended that Samantha participate in counseling.

On April 12, 2011, Chatman visited S.M. at the family home to make sure that P.E. was not living there. S.M. told Chatman that neither she nor the children had seen or spoken to P.E. since he left the home on March 22. Chatman reported that S.M. again agreed that P.E. had "to remain outside the home until further investigation" was completed.

On May 25, 2011, Chatman conducted another visit to determine if S.M. was keeping P.E. out of the home as she had agreed on March 22. S.M. again reported that P.E. had not been present in the home since that date.

On June 29, 2011, Chatman prepared a written case plan memorializing S.M.'s prior agreement to keep P.E. out of the home where Samantha was residing. The plan documented that S.M. "agreed to keep [P.E.] out of the home until all services recommended by the Division are completed by [P.E.], such as counseling and a psychological evaluation." Chatman and S.M. signed the case plan on June 29.

On July 15, 2011, the Division filed a verified complaint for care and supervision of the three children under Title Nine and Title Thirty. On that same date, the trial judge issued an order to show cause granting the Division's request. The judge's order also noted that "[t]here are serious allegations made by a child in the home that [P.E.] engaged in inappropriate sexual acts with the child. If he is barred from the home, care and supervision by [the Division] is appropriate." The order further provided that P.E. was "barred from all contact by phone, in person, or any other means with all the children in the home until this matter returns to court." On July 29, 2011, the Division received a referral from the prosecutor's office stating that P.E. was again

residing in the family home with S.M., Samantha, and the two other children. Natasha Walden, a Division supervisor, testified at the hearing concerning the Division's investigation of this referral.

S.M. told a Division caseworker that P.E. was not living in or visiting the home. However, S.M. admitted that P.E. called her at the residence on a daily basis. S.M. gave the caseworker an address where P.E. purportedly lived but, upon further investigation, the Division learned that P.E. had only asked the owner of that residence if he could use that location as a mailing address.

When the caseworker spoke to Samantha, the child stated that P.E. last called the house a couple of months prior to the interview. Lori told the caseworker that she had spoken to P.E. on the telephone the day before. Lori also acknowledged that P.E. frequently stayed overnight in the home or would sometimes leave at night and return in the morning.[5] Nora reported that she had seen P.E. in May and last spoke to him on the telephone on July 4. Based upon the violation of the March 22, 2011 agreement that S.M. keep P.E. out of the home, the Division made arrangements for the three children to temporarily reside with S.M.'s sister.

---

[5] During their interviews with Detective Santos, P.E. and S.M. both acknowledged that prior to Samantha's disclosures, P.E. usually worked overnight and returned home in the mornings.

At the hearing, the Division also presented the testimony of C.J., who was P.E. and S.M.'s neighbor. C.J. testified that she saw P.E. exiting the home in late June 2011, a date she remembered because it was the same night as a concert she was going to attend. C.J. also saw P.E. at the home on July 4, 2011, and again on several other occasions in July and August 2011.

After the Division rested its case, the Law Guardian called Samantha as a witness. Samantha testified in the trial judge's chambers with only the judge and her attorney present. However, P.E. and S.M.'s attorneys, and the Deputy Attorney General on behalf of the Division, provided the judge with proposed questions in advance, and were able to listen to the testimony in the courtroom on a speaker. Prior to her testimony, Samantha promised to tell the truth.

After Samantha provided the trial judge with some background information concerning her age, her siblings, and her parents, the judge questioned the child about her allegation that P.E. had sexually assaulted her. At that time, Samantha stated, "Well, I actually don't remember that. I don't remember it, like that far back." Samantha also testified that she did not remember telling anyone at her school about the assaults. The judge then asked the child, "Did [P.E.] ever touch you improperly?" Samantha replied, "I don't recollect . . . like inappropriately . . . [a]s far as

I remember."  The child also denied remembering speaking to a detective about the incidents.

At that point, the trial judge terminated the questioning and returned to the courtroom.  After discussing the matter with the attorneys, the judge decided not to attempt to ask Samantha any additional questions.  The judge explained that Samantha had "been put through quite a bit" and he did "not want to further the trauma of going through this."

The Law Guardian did not call any other witnesses.  In her summation, the Law Guardian supported the Division's position that P.E. had sexually abused Samantha and that S.M. had abused or neglected the children by permitting P.E. to return to the home in violation of her agreement.  P.E. and S.M. did not testify or call any witnesses.

On March 5, 2012, the trial judge rendered a thorough oral opinion.[6]  The judge found that the Division had demonstrated by a preponderance of the evidence that P.E. sexually assaulted Samantha and that S.M. abused or neglected the children by failing to abide by her agreement to keep P.E. away from them while the matter was under investigation and all services were completed.

---

[6] The judge delivered his oral decision by reading from a written opinion he had prepared.  The judge provided the parties with a copy of the written opinion for their convenience.

With regard to Samantha's accounts of the incidents with P.E., the judge found that during her interview with Detective Santos on the day she disclosed the assaults, Samantha was

> articulate, specific, and frank about what [P.E.] had been doing. The detail, which [Samantha] provided, makes it virtually certain that the improper sexual abuse by [P.E.] occurred. It is difficult to fathom how any objective observer reading the transcript and seeing the interview on DVD could doubt that at that time [Samantha] was telling the painful truth. On multiple occasions, [P.E.] sexually abused his . . . stepdaughter[.]

The judge next addressed Samantha's lack of memory of these events when she testified at the hearing. In giving this "recantation" little weight, the judge stated:

> This lovely, ambitious child . . . has obviously been put in the middle of a very difficult situation. She was so verbal and well-spoken and congenial on all other matters unrelated to the sexual abuse. As soon as questions about the sexual abuse started, [Samantha] obviously felt the need to cover up what had happened in order to protect herself, her mother, her stepfather, and her siblings from further problems. Her testimony of sexual abuse in the area was obviously rehearsed.

> She is now [thirteen] years of age. In her statement to the Prosecutor's Office she claimed that the last time [P.E.] sexually abused her was in February 2011. [Samantha] gave a very stark statement to the Prosecutor on March 22[,] 2011. It is impossible to believe that this . . . outgoing, friendly, and well-spoken child did not recall the

A-1961-14T2

numerous statements she gave less than a year before she came to court.

Based upon these observations of the child as she gave her statement to Detective Santos and when she testified in chambers, the judge concluded:

> I specifically find by far more than the greater weight of the evidence that [P.E.] sexually abused [Samantha] on numerous occasions in violation of our statute, N.J.S.A. 9:6-8.21. I find [Samantha's] multiple statements affirming that her stepfather sexually abused her to be trustworthy. She noted that her stepfather would say he was sorry after the abuse. That is quite credible. [Samantha's] late recantation was obviously false.

Turning to the allegations against S.M., the judge found that S.M. "failed to exercise the minimum degree of care the law requires by her failure to provide the child with proper guardianship" under Title Nine. The judge found that S.M. "was very aware of the serious allegations that had been made against [P.E.] involving the sexual abuse of her child." Yet, S.M. permitted P.E. to return to the home and have contact with Samantha and her siblings.

In so ruling, the trial judge specifically found that C.J.'s testimony concerning her observations of P.E. at the home in late June and early July 2012 was credible. C.J.'s testimony also corroborated Lori's account of P.E.'s repeated visits to the home

and telephone contact with the children.  Because S.M. had agreed in the case plan to bar P.E. from the home, the judge found that she "was grossly negligent" toward Samantha's safety.

## II.

After the trial court entered an order terminating the litigation on November 12, 2014, P.E.'s and S.M.'s appeals followed.  On appeal, P.E. argues that "the trial court erred in finding that [he] committed an act of abuse and neglect against Samantha because no credible evidence was provided to support the trial court's findings."  In her appeal, S.M. asserts that "there was no evidence of a nexus between the violation of the court order and an imminent danger or substantial risk of harm."  We disagree with defendants' contentions.[7]

---

[7] The Division continues to support the trial court's determination and asserts that the court's findings concerning both P.E. and S.M. are "supported by substantial credible evidence and should be affirmed."  However, the Law Guardian, on behalf of the three children, now asserts "no position" on the merits of defendants' respective appeals.  The Law Guardian explains that it has taken that tact because "[t]he family is reunified, [Samantha] is good, and all look forward to closure."  In his reply brief, P.E. complains that the Law Guardian has taken "no position" on the question of whether he abused or inappropriately neglected Samantha as the trial judge found.  However, this argument lacks merit.  The Law Guardian acts as an independent advocate for the children, not for their parents.  Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div.), certif. denied, 174 N.J. 39 (2002).  Law [G]uardians are obliged to make recommendations as to how a child client's desires may best be accomplished, [and] to express any concerns regarding the child's

Our review of the trial judge's factual finding of abuse or neglect is limited; we defer to the court's determinations "when supported by adequate, substantial, credible evidence." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 89 (App. Div. 2008) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). The trial court is best suited to assess credibility, weigh testimony and develop a feel for the case, and we extend special deference to the Family Part's expertise. N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010); Cesare, supra, 154 N.J. at 413. Unless the trial judge's factual findings are "so wide of the mark that a mistake must have been made" they should not be disturbed, even if we would not have made the same decision if we had heard the case in the first instance. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (internal quotation marks and citation omitted). "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support" the judge's decision. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012).

---

safety. . . ." Ibid. By advocating on behalf of the three children that the current status quo should be maintained in this case, the Law Guardian has properly discharged that responsibility without taking sides on the merits of the abuse or neglect finding on behalf of the children.

In pertinent part, N.J.S.A. 9:6-8.21(c) defines an "abused or neglected child" as a child:

> whose parent or guardian . . . (3) commits or allows to be committed an act of sexual abuse against the child; [or] (4) a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

A court does not have to wait until a child is actually harmed or neglected before it can act in the welfare of that minor. N.J. Div. of Youth & Family Servs. v. V.M., 408 N.J. Super. 222, 235-36 (App. Div.) (citing In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)), certif. denied, 200 N.J. 505 (2009). Nor does harm to the child need to be intentional in order to substantiate a finding of abuse or neglect. M.C. III, supra, 201 N.J. at 344.

In determining a case of abuse or neglect, the court should base its determination on the totality of the circumstances. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). A finding of abuse or neglect must be based on a preponderance of the evidence. N.J.S.A. 9:6-8.46(b).

16                                                                A-1961-14T2

Applying these standards to this matter, we are satisfied that there was competent, credible evidence in the record to support the trial judge's finding by a preponderance of the evidence that P.E. sexually abused Samantha over a six-month period. N.J.S.A. 9:6-8.21(c)(3). Accordingly, we reject P.E.'s contention that there was insufficient evidence of corroboration of Samantha's statements concerning the sexual assaults as required by N.J.S.A. 9:6-8.46(a)(4).

N.J.S.A. 9:6-8.46(a)(4) provides that "previous statements made by the child relating to allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." Corroboration may include "eyewitness testimony, a confession, an admission or medical or scientific evidence." N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 547 (App. Div. 2014) (quoting N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)). However, corroborative evidence may also be circumstantial, as we have recognized that there often is no direct physical or testimonial evidence to support a child's statements. N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002). "The corroborative evidence need not relate

directly to the alleged abuser, it need only provide support for the out-of-court statements." Ibid.

Physical evidence of assault is certainly corroborative, but it is rare "because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation." Ibid. (citation omitted). Thus, corroboration may also be established by evidence of emotional impacts, such as nightmares and other psychological conditions. Ibid.

While much of the Division's evidence derives from Samantha's statements detailing P.E.'s sexual assaults, there is sufficient corroboration in the record to support those statements based upon Dr. Medina's expert testimony. After examining the child, Dr. Medina opined, based upon her "specialized knowledge about child sexual abuse," that the "emotional stress" Samantha was experiencing because of the assaults manifested itself in the "difficulties" the child was having "concentrating and also sleeping."

According to Dr. Medina's uncontradicted expert testimony, Samantha's stress as a result of the assaults and of P.E.'s threats that the family would suffer if the child revealed what had occurred, was "significant" and constituted "the most common presentation in children who have been abused." However, Dr.

Medina also noted that Samantha's emotional difficulties could "present as school performance . . . problems[.]"  As noted above, the Division documented that Samantha's standardized test scores fell during this period.

Thus, contrary to P.E.'s contention, Samantha's statements concerning his assaultive behavior was amply corroborated by Dr. Medina's expert testimony and evaluation of the child.  Z.P.R., supra, 351 N.J. Super. at 456.  However, for the first time on appeal, P.E. now argues that Dr. Medina's corroboration of the sexual assault was an impermissible net opinion.  This argument also lacks merit.

First, P.E. did not challenge Dr. Medina's qualifications to provide expert testimony on child sexual abuse at trial.  He also did not object to any portion of her testimony.  Although under the plain error rule we will consider allegations of error not brought to the trial court's attention that have a clear capacity to produce an unjust result, see Rule 2:10-2; we generally decline to consider issues that were not presented at trial.  Nieder v. Royal Indem. Ins. Co. 62 N.J. 229, 234 (1973).  As the Supreme Court has cogently explained:

> Appellate review is not limitless.  The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves.

A-1961-14T2

> Although "[o]ur rules do not perpetuate mere ritual[,]" we have insisted that in opposing the admission of evidence, a litigant "must make known his position to the end that the trial court may consciously rule upon it." State v. Abbott, 36 N.J. 63, 76 (1961). This is so because "[t]he important fact is that the trial court was alerted to the basic problem[.]" Id. at 68. In short, the points of divergence developed in the proceedings before a trial court define the metes and bounds of appellate review.
>
> [State v. Robinson, 200 N.J. 1, 19 (2009).]

As noted, P.E.'s present contention that Dr. Medina rendered only a net opinion was not raised before the trial court. Therefore, we need not review it under the circumstances of this case.

In any event, "[w]e rely on the trial [judge's] acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon, noting that the trial court is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [his] testimony." D.M.H., supra, 161 N.J. at 382 (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)). Therefore, we exercise limited review of a trial judge's decision to admit or exclude expert testimony. See Townsend v. Pierre, 221 N.J. 36, 52-53 (2015) ("The admission or exclusion of expert testimony is committed to the sound discretion of the trial court."); Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)

(stating that trial court's evidentiary decision to admit expert testimony is reviewed for an abuse of discretion).

The Court in <u>Townsend</u> reviewed the law on net opinions. Expert opinions must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." <u>Townsend</u>, <u>supra</u>, 221 <u>N.J.</u> at 53 (quoting <u>Polzo v. Cnty. of Essex</u>, 196 <u>N.J.</u> 569, 583 (2008)). The net opinion rule is a "corollary of [<u>N.J.R.E.</u> 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." <u>Id.</u> at 53-54 (quoting <u>Polzo</u>, <u>supra</u>, 196 <u>N.J.</u> at 183).

Therefore, an expert is required to "give the why and wherefore that supports the opinion, rather than a mere conclusion." <u>Id.</u> at 54 (quoting <u>Borough of Saddle River v. 66 E. Allendale, LLC</u>, 216 <u>N.J.</u> 115, 144 (2013)). The net opinion rule directs that experts "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." <u>Id.</u> at 55 (quoting <u>Landrigan v. Celotex Corp.</u>, 127 <u>N.J.</u> 404, 417 (1991)).

On the other hand, "[t]he net opinion rule is not a standard of perfection." <u>Id.</u> at 54. An expert may ground an opinion in

21

his or her personal experience and training. See State v. Townsend, 186 N.J. 473, 495 (2006); Rosenberg v. Tavorath, 352 N.J. Super. 385, 403 (App. Div. 2002) ("Evidential support for an expert opinion is not limited to treatises or any type of documentary support, but may include what the witness has learned from personal experience."). The failure to rely on sources the opponent deems important, or to organize one's opinion in a way the adversary considers appropriate, does not warrant exclusion as a net opinion. Townsend, supra, 221 N.J. at 54. These matters are left for cross-examination. Id. at 54-55.

Applying these principles, we discern no basis for P.E.'s complaint that Dr. Medina rendered a net opinion. Dr. Medina fully explained the grounds for her conclusions and was subject to cross-examination concerning them. Dr. Medina's many years of experience and training as a board-certified pediatrician specializing in cases involving child sexual abuse, including her most recent position as the medical director of the Dorothy B. Hersh Regional Child Protection Center in New Brunswick, provided an ample foundation for her expert opinion that Samantha's emotional stress was caused by P.E.'s assaults. Under these circumstances, Dr. Medina's findings plainly did not constitute an impermissible net opinion. She was well qualified, her testimony and written report addressed all the relevant issues,

and her conclusions were firmly supported by the facts in the record.

We are also not persuaded by P.E.'s contention that the trial judge failed to give adequate weight to Samantha's "recantation" at the hearing when she told the judge that she did not remember reporting the sexual assaults to anyone or that P.E. had assaulted her. The judge meticulously summarized the evidence in his decision before finding Samantha's out-of-court statements to be more credible than her in-court recantation.

As noted above, Samantha's previous statements, one of which was videotaped after Detective Santos advised the child of the need to be truthful, were properly considered by the trial judge because they were corroborated. Y.A., supra, 437 N.J. Super. at 547. Accordingly, the judge "could properly reject as incredible the testimony of [Samantha] at trial which was inconsistent with [her] prior statements." State in the Interest of R.V., 280 N.J. Super. 118, 121 (App. Div. 1995).

The trial judge's credibility findings on this issue were well supported by the record. The judge explained that he found Samantha's sudden lack of memory to be entirely inconsistent with the great level of detail included in her prior statements to Chatman, Detective Santos, and Dr. Medina. He also observed that the child's demeanor during this portion of her testimony appeared

to be "rehearsed" and out of character with that displayed in the earlier portion of her testimony at the hearing, and in the video-taped statement she gave to Detective Santos. Under these circumstances, we perceive no grounds for disturbing the judge's reasoned determination that Samantha was telling the truth in her earlier statements and that her "late recantation was obviously false."

Finally, P.E. cites State v. Clawans, 38 N.J. 162 (1962), and argues that the trial judge should have drawn an adverse inference against the Division because it did call Samantha's classmates as witnesses concerning the statements she made to them about P.E.'s sexual assaults. This argument also lacks merit.

Once again, P.E. did not raise this contention before the trial judge and, therefore, we are not obligated to consider it for the first time on appeal. Robinson, supra, 200 N.J. at 19. Moreover, the factfinder may only draw an adverse inference "when a party's failure to present evidence 'raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him [or her].'" Torres v. Pabon, 225 N.J. 167, 181 (2016) (quoting Clawans, supra, 38 N.J. at 170). Therefore, "the adverse inference instruction 'is not invariably available whenever a party does not call a witness who has knowledge of relevant facts.'" Ibid. (quoting State v. Hill, 199 N.J. 545,

561 (1999)).  Indeed, the inference can only be drawn if the absent witness's "testimony would have been superior to that already utilized in respect to the fact to be proved."  Id. at 181-82 (quoting Clawans, supra, 38 N.J. at 171).

Here, the Division presented the testimony of Chatman and Dr. Medina concerning Samantha's assertion that P.E. sexually assaulted her at least ten times over a six-month period and then told her not to disclose the assaults to anyone because the family would suffer.  The Division also presented a DVD of the interview Detective Santos conducted with Samantha.  As noted above, Samantha stated during that interview that she knew the difference between the truth and a lie and that she promised to tell the truth.  Thus, any additional testimony from Samantha's classmates would have been cumulative, rather than "superior to that already utilized" to prove the sexual assaults.  Accordingly, we affirm the trial judge's determination by a preponderance of the evidence that P.E. sexually abused Samantha in violation of N.J.S.A. 9:6-8.21(c)(3).

B.

For the following reasons, we also reject S.M.'s argument that the trial judge erred in finding that she abused or neglected Samantha and her two siblings by permitting P.E. to return to the house in violation of a safety plan that was put in place on March 22, 2011 when Samantha's allegations were first disclosed.  There

25

is clearly sufficient credible evidence to support the judge's determination.

Pursuant to N.J.A.C. 3A:10-3.2(d), "a [Division] child protective investigator shall, in the event that a factor which makes the child unsafe has been identified, develop and implement a safety plan to assure the child's safety with the parent or caregiver." This regulation further provides that "[i]f the safety plan cannot assure the safety of the alleged child victim, the child protective investigator shall remove the alleged child victim from the home[.]"

Here, Chatman, who was the Division's investigator, met with S.M. on March 22, 2011, the day Samantha reported that P.E. had been sexually assaulting her for months. At that time, S.M. agreed to keep P.E. out of the home and away from the children until the Division completed its investigation.

Thereafter, Chatman followed up with S.M. on April 12, 2011, and again on May 25, 2011, to confirm that S.M. was abiding by the safety plan and preventing P.E. from entering the home until the was completed. S.M. continued to assert that P.E. had not been at the home since March 22, 2011.

On June 29, 2011, Chatman prepared a written case plan that included S.M.'s agreement to keep P.E. out of the home until all services had been completed. S.M. signed the case plan. After

the Division filed its complaint for care and supervision of the children on July 15, 2011, the trial judge included the restraint against P.E. being at the home or contacting the children in a court order issued on that date.

In support of its allegation that S.M. violated the safety plan by permitting P.E. to re-enter the home, the Division presented the testimony of defendants' neighbor, C.J., who saw P.E. at the home at the end of June 2011, on July 4, 2011, and on other occasions in July and August 2011. The trial judge found that C.J.'s testimony was credible.

Defendants' children also told a Division caseworker that P.E. had been contacting the children and visiting the home. Samantha reported that she spoke to P.E. at least once on the telephone; Nora stated she saw P.E. at the home in May and spoke to him on July 4; and Lori stated that P.E. had stayed overnight at the home after the safety plan was put in place. The children's statements were properly admitted in evidence because they were corroborated by C.J.'s observations of P.E. at the home. Y.A., supra, 437 N.J. Super. at 547.

N.J.A.C. 3A:10-7.5(a)(2) specifically states that in determining whether abuse or neglect has been substantiated, the Division "shall consider . . . [t]he perpetrator's failure to comply with court orders or clearly established or agreed-upon

conditions designed to ensure the child's safety, such as a child safety plan or case plan[.]" Here, the uncontradicted evidence presented at the hearing amply demonstrated that S.M. permitted P.E. to enter the home in violation of the March 22, 2011 child safety plan to which she voluntarily agreed; the June 29, 2011 written case plan; and the trial court's July 15, 2011 order granting care and supervision of the three children to the Division.

S.M. argues that even if she violated the safety plan, the Division failed to demonstrate "a nexus" between that clear violation "and an imminent danger or substantial risk of harm" to the children. This argument is clearly without merit.

Samantha alleged that P.E. sexually assaulted her on at least ten occasions. Her account of these events was consistent and detailed. Under these circumstances, the Division had two options to protect Samantha and her siblings from the danger of further abuse while it and the prosecutor's office continued their investigation: (1) the children could be removed from defendants' home and placed elsewhere, or (2) P.E. could voluntarily leave the home, with S.M. ensuring that he did not return until the investigation was completed. S.M. agreed to the latter alternative, which enabled the children to stay with her at home, while removing the source of the danger, P.E.

We have long recognized that even if there is no evidence that a child has been physically or emotionally harmed, a trial court may make a finding of abuse or neglect "based on proof of imminent danger and substantial risk of harm." N.J. Dep't of Children & Family Servs. v. A.L., 213 N.J. 1, 23 (2013). S.M. was fully aware of the allegations against P.E., including the fact that he threatened that the family would be without food if Samantha reported the abuse. S.M. also voluntarily agreed to the March 22, 2011 safety plan, which was designed to keep P.E. away from the children to ensure that another sexual assault did not occur.

Yet, S.M. repeatedly violated the safety plan, thus permitting a man accused of sexually abusing one of her children to have unsupervised contact with all three of them. Although there is no evidence that P.E. sexually assaulted Samantha again after her March 22, 2011 disclosure or harm the other two children, the trial judge's determination that S.M.'s "gross negligence" placed Samantha and her sisters in danger of such harm is unassailable. Therefore, we affirm the judge's conclusion that S.M. abused or neglected the children by violating the safety plan.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1961-14T2