**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1928-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ISAAC J. GREY, a/k/a
YUSIN J. RAVENELL, and
ISSAC RAVENELLGREY,

     Defendant-Appellant.

_____

Argued November 8, 2023 – Decided November 20, 2023

Before Judges Haas and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-04-0223.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., Assistant Deputy Public Defender, of counsel and on the briefs).

Jeffrey C. McElwee, Jr., Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer

County Prosecutor, attorney; Jeffrey C. McElwee, Jr.,
on the brief).

PER CURIAM

In an April 13, 2018 superseding indictment, a Mercer County grand jury charged defendant Isaac J. Grey with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon (knife), N.J.S.A. 2C:39-5(d); second-degree tampering with a witness, N.J.S.A. 2C:28-5(d); third-degree tampering with a witness, N.J.S.A. 2C:28-5(a); and fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7.

After a multi-day trial, the jury convicted defendant of murder, possession of a weapon for an unlawful purpose, and both counts of witness tampering. The jury acquitted defendant of unlawful possession of a weapon. Based upon that verdict, the State agreed to dismiss the certain persons not to have weapons charge.

At sentencing, the trial judge merged the possession of a weapon conviction into the murder count, and the third-degree tampering with a witness conviction into the second-degree tampering conviction. The judge sentenced defendant to forty years in prison on the murder conviction, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act,

N.J.S.A. 2c:45-7.2, and to a consecutive seven-year prison term on the witness tampering conviction.

On appeal, defendant raises the following contentions:

POINT I

THE DEFENDANT WAS DENIED HIS RIGHT TO CONFRONTATION WHEN THE TRIAL COURT HELD THE GROSS[1] HEARINGS AT THE END OF THE TRIAL, WELL AFTER THE TESTIMONY OF THE TWO-DECLARANT WITNESSES, THUS DENYING DEFENDANT HIS RIGHT TO CROSS-EXAMINE THE DECLARANTS ABOUT THEIR PRIOR STATEMENTS.

A. Danielle Rogers.

B. Ernest McCleese.

C. Legal Argument.

POINT II

DEFENDANT WAS DENIED A FAIR TRIAL ON THE MURDER COUNT BY THE JUDGE'S REFUSAL TO GIVE AN ADVERSE INFERENCE CHARGE BASED UPON THE PROSECUTOR'S FAILURE TO PRESERVE A CRUCIAL PORTION OF A SURVEILLANCE VIDEO.

A. Detective Osterman's Testimony.

---

1 State v. Gross, 121 N.J. 1 (1990).

B.   The Fact That The Defense Could Not Establish A <u>Brady</u>[2] Violation Did Not Justify the Trial Court's Refusal To Give An Adverse Inference Charge.

Having considered defendant's arguments in light of the record and the applicable law, we affirm.

I.

Late in the evening of June 30, 2015, Bayshawn Chavis found the victim, Edward Nock, bleeding in the living room of Nock's apartment. The State's proofs at trial provided the following timeline of events.

Chavis lived in the same apartment complex as Nock. Earlier in 2015, Chavis learned that defendant, defendant's girlfriend Lillian Robinson, and Robinson's young child were homeless. Chavis knew Nock was not using his apartment at that time. Chavis asked Nock if defendant, Robinson, and the child could stay in Nock's apartment beginning in June 2015. Nock agreed.

Robinson testified that soon after moving in, defendant allowed another woman, Ebony Durant, to live in the apartment. Robinson described Durant as defendant's "other girlfriend." Defendant also permitted a man named Kevin to move in.

---

[2] <u>Brady v. Maryland</u>, 373 U.S. 51 (1988).

4

Sometime before 1:00 p.m. on June 30, 2015, Nock returned to the apartment for the first time and found five people now living there. Robinson testified that the adults all sat around together "drinking" and "getting high," but that Nock and defendant argued "two or three times" during the course of the day. According to Robinson, the arguments were "[a]bout a lot of people being in [Nock's] apartment that he didn't know about." Defendant, Robinson, Durant, and Nock also made a trip to the liquor store because Nock wanted alcohol.

Robinson stated that at some point during the day, Nock asked everyone to leave, but he refused to let them take their possessions with them. Robinson testified the cycle of arguments and peacemaking attempts continued for about eight hours.

Sometime before 9:26 p.m., defendant and Nock began to argue again. Robinson testified that Durant told them to calm down but instead defendant "reached on his side and got a knife." Defendant held the knife in his hand and was "like just arguing with [Nock], and then he stabbed him in the stomach."

Defendant immediately told Robinson to "get all your stuff with everything with your name on it" so that "it can't be traced back to anybody that was in the house." Video evidence showed all of the apartment's occupants, except Nock, exiting the front of the apartment complex at 9:26 p.m.

Robinson testified that Durant and Kevin split from the group. Defendant stated he was going to drop the apartment keys off with someone. Defendant then met back up with Robinson and her child and they stayed with friends that night in Trenton. The next morning, they went to defendant's sister's house in Philadelphia.

According to a statement Chavis's girlfriend, Danielle Rogers, provided to the police, defendant knocked on her door, admitted he had stabbed Nock, gave her Nock's apartment keys, and told her to have Chavis "call the cops." Rogers called Chavis and "told him to come home quick." Once Chavis returned to his and Rogers's shared apartment, Rogers "told him what happened" and gave him the keys.[3]

Chavis testified he took the keys and went to Nock's apartment. He found Nock bleeding on the couch and called an ambulance. When the police arrived, Chavis identified defendant as a potential suspect and provided them with his physical description. Nock was taken to the hospital where he died at approximately 11:20 p.m. from blood loss from a stab wound to his abdomen.

---

[3] At trial, Rogers repudiated her statement. After allowing the State and defense counsel to examine Rogers on the witness stand, the trial judge conducted a Gross hearing and determined that Rogers's statement was admissible. This issue will be discussed in greater detail in Section II of this opinion.

At trial, Chavis testified he ran into defendant earlier in the evening around 9:00 p.m. outside of "the corner store" that was across the street from the apartment complex. Chavis and defendant briefly discussed the issues defendant was having with Nock, including defendant's assertion that Nock was trying to have sex with Durant. Defendant told Chavis he wanted to "poke him up," meaning stab Nock. Chavis testified he told defendant that Nock "ain't worth it" and defendant should "[j]ust get your stuff and just get out of his house."

When the conversation ended, Chavis went to a friend's house. About forty-five minutes later, he received a call from Rogers telling him that defendant was at the apartment with Nock's keys.

The Philadelphia Police arrested defendant in Philadelphia the next day. He was later extradited to New Jersey. State Police Detective John DeHart testified that he and a detective from the prosecutor's officer picked up defendant in Philadelphia on September 28, 2015. During the ride back to New Jersey, defendant spontaneously stated "that he stabbed [Nock] in self-defense." DeHart pulled over and read defendant his Miranda[4] rights. After defendant signed the Miranda card, he made no further statements.

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1928-19

On April 12, 2018, defendant, Chavis, and Ernest McCleese were together in a holding cell at the Mercer County Detention Center. Chavis testified that defendant approached him and wanted to talk. Defendant claimed "some other guy" killed Nock. Defendant told Chavis that he knew that Chavis had sisters and also a child. Chavis felt threatened by the comments. Later, defendant told Chavis he could "come up with $5,000 for [Chavis] not to show up to court – or to change my statement and say the other guy did it." In order to avoid a confrontation, Chavis "told [defendant] [he] wasn't coming to court." McCleese witnessed this conversation and gave a statement to the State confirming Chavis's account.[5]

## II.

In Point I of his brief, defendant argues that his Sixth Amendment right of confrontation was violated when the trial judge directed him to cross-examine Rogers and McCleese about the statements they gave to the police and

---

[5] McCleese repudiated this statement at trial and claimed that he did not hear anything that defendant said and, instead, received all the information he told the police from Chavis. After allowing the State and defense counsel to examine McCleese on the witness stand, the trial judge conducted a Gross hearing and determined that McCleese's statement was admissible. This issue will be discussed in greater detail in Section II of this opinion.

repudiated at trial before determining at a <u>Gross</u> hearing that the statements were admissible. We disagree.

By way of background, a party seeking to admit a prior inconsistent statement as substantive evidence at trial must satisfy the standards of N.J.R.E. 803(a)(1). That rule provides hearsay exceptions not dependent on a declarant's unavailability, including situations where a "declarant-witness testifies and is subject to cross-examination about a prior otherwise admissible statement," and the statement "is inconsistent with the declarant-witness'[s] testimony at the trial or hearing . . . ." N.J.R.E. 803(a)(1).

If a witness testifies at trial that they cannot recall the underlying incident or whether they even made such a statement, a prior inconsistent statement may be admitted into evidence under this rule if the lack of recall was feigned by the witness. <u>State v. Brown</u>, 138 N.J. 481, 542 (1994), <u>overruled on other grounds by</u> <u>State v. Cooper</u>, 151 N.J. 326, 377 (1997). In other words, "a 'judge may . . . conclud[e] under the circumstances the claimed lack of memory of the event is untrue and in effect an implied denial of the prior statement, thus qualifying [the prior statement] as inconsistent and nonhearsay.'" <u>State v. R.Y.</u>, 242 N.J. 48, 70 (2020) (quoting <u>Brown</u>, 138 N.J. at 542).

Where such feigned lack of recollection occurs, the practical limitations on cross-examination do not rise to the level of a Confrontation Clause violation. State v. Cabbell, 207 N.J. 311, 337 (2011). However, when it is revealed in an N.J.R.E. 104 hearing that a witness asserts they are unable to recall certain facts, even if feigned recollection is suspected, the witness should still take the stand as the allegedly inconsistent prior statement is only admissible if the witness testifies before the jury. State v. Slaughter, 219 N.J. 104, 117 (2014) (citing Cabbell, 207 N.J. at 336-37).

When the statement in question was not made under oath and is being offered by the party calling the witness, as here, the trial court must evaluate the reliability of the statement under the framework established in State v. Gross, 216 N.J. Super. 98, 109-10 (App. Div. 1987). The Gross factors direct trial courts to evaluate the reliability of such prior inconsistent statements by analyzing:

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the

extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.

[Gross, 121 N.J. at 10.]

With this essential background in mind, we next review what transpired at trial concerning the statements provided by Rogers and McCleese. On the fourth day of trial, the prosecutor learned that Rogers had indicated she would not comply with a subpoena to testify at trial. The judge held a N.J.R.E. 104 hearing at which Rogers testified. Rogers stated she did not stand by what she said in the statement she gave to the police about defendant bringing the keys to Nock's apartment to her so that she could give them to Chavis. The judge excused Rogers so that she could confer with her attorney.

The State then presented the testimony of Detective Roberto Reyes, who had taken Rogers's statement. Reyes testified that he recorded Rogers's answers

to his interview questions "word for word" and typed a statement, which Rogers reviewed for accuracy, and then signed.

Rogers returned to the courtroom and again told the judge she did not intend to testify. Later in the afternoon, Rogers was sworn in for testimony before the jury. When questioned by the State, Rogers denied knowing defendant and denied making the statement to Reyes. Rogers repeatedly answered "no" or "I don't know" to questions about the night of the incident.

At the end of the State's direct examination, the State advised the judge that it would seek to admit Rogers's previous statement under the Gross decision. Defense counsel stated that if the court ultimately decided to admit the statement, he should be given the opportunity to cross-examine Rogers. However, the court told him that if the statement was later formally admitted "you won't be able to cross-examine a piece of paper, but this is your opportunity to cross-examine the witness."

Defense counsel then cross-examined Rogers. Through his thorough questioning, defense counsel was able to get Rogers to state that no one ever asked her to give information to the prosecutor's office about the events of June 30, 2015; she never met with the prosecutor's office; she did not remember being

12

in the apartment complex on that date; she did not know Nock; she never met defendant; and had not seen or heard from Chavis since June 2015.

Later that day, the State called Reyes to testify before the jury. He repeated his N.J.R.E. 104 hearing testimony concerning the statement he took from Rogers.

That same afternoon, McCleese took the stand before the jury. He contended that contrary to what he had told the police in his statement, he did not hear anything defendant said to Chavis in the jail cell. He could only hear what Chavis said. McCleese claimed that all the information he put in the statement came from Chavis. McCleese also asserted that he provided the information that he did in the statement so the prosecutor's office would "help [him] with [his] case."

Before the State completed its direct examination, the judge reminded defense counsel that "when it's your turn to cross-examine, you may very well want to . . . go ahead and cross[-]examine [McCleese] how you see fit" because after a Gross hearing the entire statement could be admitted into evidence. When the State completed its direct examination, defense counsel got McCleese to admit that the information in his statement had been given to him by Chavis and did not come from his personal knowledge.

A-1928-19

The State then called Detective Scott Peterson, who had taken McCleese's statement. Peterson stated he recorded the questions and answers during the interview and that McCleese reviewed and signed the written statement. Peterson stated there was "no deal" offered to McCleese in exchange for the information he provided.

On the sixth day of trial, the court held Gross hearings outside the presence of the jury concerning Roger's and McCleese's prior inconsistent statements. The judge heard oral argument and, after applying the Gross factors to each of the statements, found they were both admissible. Detective DeHart then read the two statements into the record before the jury.

The judge later instructed the jury that "[e]vidence has been presented showing that at a prior time Danielle Rogers and Ernest McCleese each said something that is inconsistent with their testimony at this trial." The judge continued, "[i]n deciding whether their respective prior statements, if made, are credible, you should consider any relevant factors including: [the judge listed the fifteen Gross factors]." The judge concluded his instruction on this matter as follows:

> [A] witness'[s] prior inconsistent statement under police questioning must be carefully examined and assessed in light of all the surrounding circumstances

A-1928-19

including their interest and given the statement at the time.

If you decide that the statement given by Danielle Rogers on July 1[], 2015 and by Ernest McCleese on April 18[], 2018 is reliable then you may consider it for its truth and weigh it along with all other evidence in this case.

However, if you decide that their respective statements are not reliable, then you may not consider it for any purpose.

On appeal, defendant does not directly contest the trial judge's determination that Rogers's and McCleese's statements were admissible based on a consideration of the Gross factors. Instead, defendant asserts that the judge should have given defense counsel a second opportunity to cross-examine the two witnesses after the Gross hearings were held and the statements entered into the record. Defendant claims that he was not able to fully cross-examine Rogers on "what she had told the police" because "it was not clear that her prior statement would even be admitted into evidence because the judge had yet to rule on its admissibility at the Gross hearing" and that "[t]he same is true for McCleese."

This argument lacks merit. Under N.J.R.E. 611(a), the trial court is entrusted with "reasonable control over the mode and order of interrogating witnesses and presenting evidence to (1) make those procedures effective for

determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  "The conduct of a trial, including cross-examination and its appropriate limits, is within the discretion of the trial court." Persley v. N.J. Trans. Bus. Ops., 357 N.J. Super. 1, 9 (App. Div. 2003). "Exercise of that discretion is ordinarily not interfered with unless there is a clear abuse of discretion which has deprived a party of a fair trial."  Ibid.

Defendant now posits that the trial judge violated his Sixth Amendment right to confrontation by having defense counsel cross-examine Rogers and McCleese when they were available in court and had testified on direct examination concerning the statements each of them had given to the police. We reject that argument.  The record belies any claim that defense counsel was precluded from posing questions to Rogers and McCleese concerning the written statements; indeed, the judge afforded defense counsel ample opportunity to conduct an exhaustive cross-examination of the two witnesses.  Counsel took full advantage of that opportunity and had each witness confirm that they were not standing by the statements they previously gave to the police.

We add that defendant has not specified any questions his counsel was precluded from posing by the judge's decision.  We therefore conclude that defendant was not deprived of the right to a fair trial.  To the contrary, defendant

was given a full and fair opportunity at trial to confront the evidence the State presented against him, including Rogers's and McCleese's prior inconsistent statements that were admitted as substantive evidence.

## III.

In Point II, defendant argues that he was denied a fair trial on the murder count because of the trial judge's "refusal to give an adverse inference charge based upon the prosecution's failure to preserve a crucial portion of the surveillance video." Specifically, defendant alleges that the State collected but did not turn over twenty-five minutes of video footage. Defendant argues that this missing footage may have shown either defendant, Chavis, or both returning to the apartment complex from the corner store where the alleged conversation between them occurred. If so, defendant asserts that he could have impeached Chavis's testimony by showing that defendant did not return to Nock's apartment in the time window described by Chavis. However, because the State never obtained the twenty-five minutes of footage in the first place, the judge correctly found that defendant was not entitled to the adverse inference charge he sought at trial.

"In order to establish a Brady violation, a defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the

defense; and (3) the evidence is material."  State v. Russo, 333 N.J. Super. 119, 134 (App. Div. 2000) (citing State v. Martini 160 N.J. 248, 268-69 (1999)). "Exculpatory evidence includes not only material that is directly exculpatory of a defendant, but also evidence that may impeach the credibility of a State witness." Ibid. (citing State v. Spano, 69 N.J. 231, 235 (1976)). "The materiality standard is satisfied if defendant demonstrates that there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Ibid. (citing United States v. Bagley, 473 U.S. 667, 682 (1985)).

"An adverse-inference charge" is another "permissible remedy for a discovery violation . . . ."  State v. Dabas, 215 N.J. 114, 140 (2013).  Our decisional law states that adverse inferences in favor of a criminal defendant are required in cases where: "the State fails to present a witness who is within its control, unavailable to the defense, and likely to give favorable testimony to the defendant[,]" ibid. (citing State v. Clawans, 38 N.J. 162, 170-75 (1962)); law enforcement destroyed "interview notes in the post indictment stage[,]" ibid. (citing State v. Zenquis, 251 N.J. Super. 358, 370 (App. Div. 1991)); and for the destruction of a booking room video in an instance where defense counsel explicitly requested preservation of the recording before the defendant's

indictment, State v. Richardson, 452 N.J. Super. 124, 137 (App. Div. 2017). A defendant is not "obliged to show the State acted in bad faith and the evidence was exculpatory" in order "to demonstrate a discovery violation or to justify an adverse inference charge." Id. at 138 (citing Dabas, 215 N.J. at 141). Where the evidence in question is both exculpatory and requested by defendant, any suppression by the State "violates due process, regardless of the prosecution's good faith." State v. Robertson, 438 N.J. Super. 47, 67 (App. Div. 2014), aff'd on other grounds, 228 N.J. 138 (2017).

When reviewing the decision to grant or deny an adverse inference on appeal, we must first determine "if the trial court had the legal authority to give the adverse-inference charge . . . ." Dabas, 215 N.J. at 132. Where, as here, the argument on appeal is that the trial court erred by declining to issue an adverse inference charge, the reviewing court "must then answer whether the trial court abused its discretion in not doing so." Ibid.

The facts underlying defendant's claim on this point are as follows. Sheriff's Officer William Osterman was assigned by the prosecutor's office to "pull video from the" apartment complex where Nock lived. Osterman testified before the jury that he went to the security office and asked for video available from 9:00 p.m. to 10:00 p.m. on the date of the murder, June 30, 2015. Osterman

obtained three camera views, brought the video back to the office, downloaded it onto an internal hard drive, transferred to discs, and gave the discs to Detective DeHart for the case file. The discs were all provided to defendant's counsel during discovery.

Osterman testified that the times displayed on the videos were accurate and that the time stamp of the beginning of the first video read 9:25 p.m. On cross-examination, defense counsel raised this discrepancy with Osterman and argued there must be twenty-five minutes missing from the tape Osterman had brought to court. When Osterman could not provide an immediate explanation, the trial judge dismissed the jury and conducted a N.J.R.E. 104 hearing.

During his testimony at the hearing, Osterman conceded he might not have "notice[d] that [he] didn't get from 9 to 9:25, which is very possible." He also stated that because it was time consuming to pull video, he might not have checked the videos for accuracy. Instead, he might have only checked one of the three camera angles he received and, upon seeing it possessed all the video requested, declined to check the other two angles. During the hearing, the State insisted it did not possess, or fail to produce, the twenty-five minutes in question, stating that what it produced "is what we have." The judge made a

20

preliminary ruling that there had been no Brady violation by the State, and defense counsel continued his cross-examination of Osterman before the jury.

After additional argument later in the trial, the trial judge confirmed that the State had not withheld a portion of the video Osterman obtained from defendant. The judge stated:

> Once again, Detective Osterman testified he did not edit, he did not delete it. I find he's a credible witness. I also find that [the] [S]tate['s] representation that [it] provided everything [to] the defendant that [it] had is a truthful representation. Therefore, . . . there's no basis for me to find that, number one, evidence was suppressed and certainly that it was suppressed in bad faith.
>
> In . . . conclusion, the [c]ourt finds that the defendant has not demonstrated a violation of his Brady rights, because the police never had possession of a small portion of the surveillance video, namely the nine to 9:25 on one of three camera angles.
>
> Secondly, nothing in the record indicates that the missing footage contained exculpatory evidence, and by that I mean that certainly that a third party looking at it would have been apparent that it would have exculpatory value.
>
> And, finally, number three, the [c]ourt finds the police did not act in bad faith, and failure to contain the entirety of the surveillance, this [c]ourt concludes that they never had that missing [twenty-five] minutes.

21

Later, during the charge conference, defense counsel asked the judge to give the jury the following adverse inference instruction concerning what he argued was the missing twenty-five minute segment of one of the tapes:

> You have heard testimony that the Mercer County Prosecutor's Office destroyed and failed to preserve video surveillance footage from [the apartment complex]consisting of twenty-five minutes (21:00 to 21:25) for one camera . . . looking out into the courtyard on June 30, 2015. Under our court rules, the prosecutor has a duty to produce to the defense evidence in its possession following the return of the indictment. If you find that the State has destroyed and failed to preserve evidence in its possession following the return of the indictment, then you may draw an inference unfavorable to the State which in itself may create a reasonable doubt as to defendant' guilt. In deciding whether to draw this inference, you may consider all the evidence in the case, including any explanation given as to the circumstances under which the evidence was destroyed. In the end, however, the weight to be given to the destruction of the evidence is for you and you alone to decide.

The trial judge denied defendant's request for this adverse inference jury charge. The judge stated:

> [T]his adverse inference, as drafted by defendant indicates, you've heard testimony that the Mercer County Prosecutor's Office destroyed and failed to preserve video surveillance footage. . . . [M]y findings were just the opposite. I don't want to repeat all the reasons I did on the record earlier today in denying your request for [a] <u>Brady</u> violation. Obviously, if I found there had been a <u>Brady</u> violation[,] I would be giving

22

an instruction such as what is proposed by defendant as an adverse inference, but since I found just the opposite, I will not give this adverse inference [instruction].

Under the circumstances presented in this case, we are satisfied that the trial judge did not abuse his discretion by denying defendant's request for an adverse inference jury instruction regarding Offerman's handling of the video tape.  Here, the judge found that there was insufficient evidence demonstrating that Offerman lost or destroyed a twenty-five-minute portion of the tape; he simply failed to obtain it in the first instance.  We accord great deference to the judge's finding based upon his unique opportunity to see and hear the witnesses. State v. Locurto, 157 N.J. 463, 470-71 (1999).  Because that portion of the video was never in the State's possession, it did not violate Brady by failing to provide it to the defense in discovery.

Similarly, there was no evidence that Offerman "destroyed and failed to preserve video surveillance footage" as stated by defense counsel in the proposed adverse inference charge.  Again, the judge made a factual finding, fully supported by the record, that the police "never had possession" of the twenty-five minute segment.  Because the State did not suppress any evidence in this matter, the judge did not abuse his discretion by denying defendant's request for an adverse inference charge.  Dabas, 215 N.J. at 132.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1928-19